PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JASON MANN,

     *Plaintiff-Appellant,*

    v.

HECKLER & KOCH DEFENSE,
INCORPORATED,

     *Defendant-Appellee,*

    and

HECKLER & KOCH GMBH,

     *Defendant.*

             No. 09-1847

METROPOLITAN WASHINGTON
EMPLOYMENT LAWYERS
ASSOCIATION; NATIONAL
WHISTLEBLOWERS CENTER,

  *Amici Supporting Appellant.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
James C. Cacheris, Senior District Judge.
(1:08-cv-00611-JCC-TCB)

Argued: October 28, 2010

Decided: December 27, 2010

Before TRAXLER, Chief Judge, WILKINSON, Circuit
Judge, and Bobby R. BALDOCK, Senior Circuit Judge of
the United States Court of Appeals for the Tenth Circuit,
sitting by designation.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Chief Judge Traxler and Senior Judge Baldock joined.

---

## COUNSEL

**ARGUED:** Jason Mark Zuckerman, THE EMPLOYMENT LAW GROUP, PC, Washington, D.C., for Appellant. C. Allen Foster, GREENBERG TRAURIG, LLP, Washington, D.C., for Appellee. **ON BRIEF:** R. Scott Oswald, THE EMPLOYMENT LAW GROUP, PC, Washington, D.C., for Appellant. Robert P. Charrow, Laura Metcoff Klaus, GREENBERG TRAURIG, LLP, Washington, D.C., for Appellee. Richard R. Renner, NATIONAL WHISTLE-BLOWER LEGAL DEFENSE AND EDUCATION FUND, Washington, D.C., for Amici Supporting Appellant.

---

## OPINION

WILKINSON, Circuit Judge:

Jason Mann brought a False Claims Act ("FCA") retaliation action against Heckler & Koch Defense, Inc. ("HKD"). He argued that HKD took adverse employment action against him because he investigated and opposed HKD's attempts to defraud the United States. But Mann's actions fall outside the scope of FCA protection. The FCA shields employees from retaliation when they oppose fraud. And the conduct Mann opposed involved nothing more than non-fraudulent statements made by HKD during the course of a contractual bidding process. The district court rejected Mann's claim, and we now affirm.

### I.

HKD is in the business of selling firearms to United States military and law enforcement agencies. On November 23,

2007, the Secret Service issued a contract solicitation for rifles for its counterassault team. Wayne Weber, Mann's supervisor, believed that the Statement of Work ("SOW") detailing the specifications of the rifle matched up well with HKD's HK-416 rifle. But the SOW required two components that were not available on the HK-416, ambilevers, which are devices that allow left-handed personnel to operate the rifle, and two-stage match triggers. Nevertheless, HKD submitted its bid along with sample HK-416 rifles on February 28, 2008. HKD noted that while it did not currently meet the ambilever and two-stage match trigger requirements, it would be able to provide these components if it won the bid.

Around that same time, Weber received aftermarket ambilevers for the HK-416 from consultant Larry Vickers. Mann and another HKD employee, Robbie Reidsma, thought that the ambilevers did not fit the HK-416 and did not meet HKD's typical quality standards. Vickers echoed these concerns. But Weber overruled them. In order to demonstrate that the sample HK-416 could conform to the SOW, Weber arranged to deliver the ambilevers to Jim Galvin, a friend at the Secret Service. He sent Reidsma to deliver the ambilevers to Galvin on March 3, 2008, which was after the official close of bidding.

When Weber informed Mann of this delivery, Mann expressed disapproval of Weber's handling of the bid. Mann told Weber that he should not have submitted the bid in the first place because it did not meet the SOW specifications and that he should not have delivered the ambilevers after the deadline. Mann also began investigating whether Weber's conduct violated federal contracting regulations or other laws. In early April 2008, Mann expressed his concerns about Weber's conduct to numerous HKD employees, who then relayed his concerns to HKD management.

Martin Newton, CEO of HKD, and the rest of HKD management took prompt action when they learned of Mann's

concerns. Newton immediately ordered HKD personnel to halt their informal investigation of Mann's allegations and instead retained John Einwechter, an attorney specializing in these matters, to conduct a formal investigation. HKD also put Mann on administrative leave for approximately one week starting on April 9, 2008. During the ensuing investigation, Mann relayed his concerns about Weber's conduct to Einwechter. Einwechter concluded that while Weber may have violated regulatory procedures by contacting Galvin outside of proper channels, he did not violate the FCA because there was no fraud. Weber did not conceal his actions during the bid process, and, therefore, any regulatory violation was open and apparent on its face.

As for the bid, Weber's strategy proved to be ineffective. HKD began receiving complaints from the Secret Service in April 2008 about the deficiencies in the HK-416 rifles. This was to be expected because HKD's bid submission made plain that the bid was nonconforming. The Secret Service ultimately rejected HKD's bid on May 21, 2008.

On June 11, 2008, Mann filed a complaint against HKD, asserting that HKD retaliated against him for engaging in protected activity under the False Claims Act ("FCA") ("Count I") and defamed him under Virginia law. HKD placed Mann on administrative leave again on June 24, 2008 and terminated his employment the next month. Mann contends he was dismissed because of his efforts to stop HKD's attempts to defraud the United States and his filing of a retaliation claim. HKD, however, asserts that Mann's termination stemmed from his involvement in an unlawful scheme to procure machine guns for a small police force. Mann later amended his complaint to assert an additional claim of retaliation on the theory that HKD retaliated against him for filing his initial retaliation claim ("Count II").

HKD filed a motion to dismiss all claims, which the district court granted with respect to Count II. HKD later moved for

summary judgment on the remaining claims, and the district court granted that motion on July 1, 2009. *Mann v. Heckler & Koch Defense, Inc.*, 639 F. Supp. 2d 619 (E.D. Va. 2009). The district court noted that Mann never identified any instance of HKD making a false statement or engaging in fraudulent conduct. *Id.* at 632-33. Without evidence of a false or fraudulent claim against the United States, the district court reasoned, there was no reasonable possibility that HKD was violating the FCA. *Id.* Therefore, Mann did not qualify for FCA protection. *Id.* Mann now appeals the district court's rulings with respect to his claims of retaliation under the FCA.

## II.

In this appeal, Mann contends that HKD retaliated against him for his investigation of and opposition to HKD's attempt to defraud the United States. Mann also asserts that HKD retaliated against him for his filing of the initial retaliation claim. We shall first set forth the framework for addressing anti-retaliation claims under the FCA and then proceed to address Mann's particular contentions.

## A.

The FCA is a statutory scheme designed to discourage fraud against the federal government. *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951 (5th Cir. 1994). Its roots lie in the rampant fraud perpetrated by contractors against the government during the Civil War, and it has served ever since as a safeguard against unscrupulous government contractors. *Wilkins v. St. Louis Hous. Auth.*, 314 F.3d 927, 933 (8th Cir. 2002). The cornerstone provision of the FCA prohibits any person from presenting "a false or fraudulent claim for payment or approval" to the United States. 31 U.S.C. § 3729(a).

There are two enforcement mechanisms to police this prohibition. First, the Attorney General can bring a civil action

to remedy violations of § 3729. 31 U.S.C. § 3730(a). Second, a private party can bring a qui tam action, which is an action brought in the name of the United States. 31 U.S.C. § 3730(b); *Graham County Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 545 U.S. 409, 412 (2005).

Congress amended the FCA in 1986, adding an anti-retaliation provision to protect whistleblowers. False Claims Amendments Act of 1986, Pub. L. No. 99-562, § 4, 100 Stat. 3153, 3157-58. The relevant part of this provision states:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

31 U.S.C. § 3730(h).*

The purpose of § 3730(h) is to promote enforcement of the FCA by "assur[ing] those who may be considering exposing fraud that they are legally protected from retaliatory acts." S. Rep. No. 99-345, at 34 (1986). Congress "recognize[d] that few individuals will expose fraud if they fear their disclosures will lead to harassment, demotion, loss of employment, or any other form of retaliation," and, accordingly, sought "to halt

---

*Congress amended § 3730(h) in 2009 to include contractors and agents within its scope of protection, but it explicitly stated that the amendments "shall take effect on the date of enactment of this Act and shall apply to conduct on or after the date of enactment." Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, § 4(f). The relevant conduct in the instant case occurred in 2008, well before the May 20, 2009 date of enactment. *Id.* Therefore, the amendments do not apply to the instant case.

companies and individuals from using the threat of economic retaliation to silence 'whistleblowers.'" *Id.* In furtherance of this goal, § 3730(h) creates a cause of action for employees who suffer retaliation for taking measures to prevent contractor fraud against the United States.

B.

Employees seeking to bring a cause of action under § 3730(h) must meet three elements derived from the statutory text. *Zahodnick v. Int'l Business Machines Corp.*, 135 F.3d 911, 914 (4th Cir. 1997). An "employee must prove that (1) he took acts in furtherance of a qui tam suit; (2) his employer knew of these acts; and (3) his employer [took adverse action against] him as a result of these acts." *Id.* Only the first element, referred to as the "protected activity" prong, is at issue in the instant case.

An employee need not actually file a qui tam suit to engage in protected activity, however. *Eberhardt v. Integrated Design & Constr., Inc.*, 167 F.3d 861, 867 (4th Cir. 1999). Protected activity encompasses measures taken "in furtherance of an action . . . filed or *to be filed* under this section." 31 U.S.C. § 3730(h) (emphasis added). The "to be filed" language "manifests Congress' intent to protect employees while they are collecting information about a possible fraud, before they have put all the pieces of the puzzle together." *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 740 (D.C. Cir. 1998).

Accordingly, the protected activity element includes "situations in which litigation could be filed legitimately" and excludes those in which "an employee . . . fabricates a tale of fraud to extract concessions from the employer, or . . . just imagines fraud but lacks proof." *Neal v. Honeywell Inc.*, 33 F.3d 860, 864 (7th Cir. 1994), *abrogated on other grounds by Graham County*, 545 U.S. at 416-17. Thus, employees engage in protected activity when they meet what has been called the

"distinct possibility" standard. Under this standard, protected activity occurs when an employee's opposition to fraud takes place in a context where "litigation is a distinct possibility, when the conduct reasonably could lead to a viable FCA action, or when . . . litigation is a reasonable possibility." *Eberhardt*, 167 F.3d at 869 (internal quotation marks and citations omitted).

The distinct possibility standard is an objective one. It enjoys widespread support among the circuits because it focuses attention on the ills the statute is designed to prevent. *See, e.g., Eberhardt*, 167 F.3d at 867-69; *Yesudian*, 153 F.3d at 740; *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1269 (9th Cir. 1996); *Neal*, 33 F.3d at 864, *abrogated on other grounds by Graham County*, 545 U.S. at 416-17. And the consensus view is that this standard requires that protected activity relate to company conduct that involves an objectively reasonable possibility of an FCA action. *See Eberhardt*, 167 F.3d at 867-69. Things muddy a bit when determining how to apply the test. Some courts take the perspective of the employee, considering only those facts known by the employee during the course of the protected conduct. *See Yesudian*, 153 F.3d at 740-42. Others adopt the employer's perspective, taking into account the facts known by the employer at the time of the retaliation. *See United States ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1304 (11th Cir. 2010).

This apparent disagreement is illusory. Courts who take the employer's perspective are merely combining the first element of § 3730(h), that the employee engaged in protected activity, with the second element, that the employer is aware of the employee's conduct. For example, in *Sanchez*, the 11th Circuit posed the dispositive question as whether "an employee's actions . . . are sufficient to support a reasonable conclusion that the employer could have feared being . . . sued in a qui tam action." *Id.*

Combining the protected activity and notice elements is a perfectly reasonable approach when both elements are in dispute. But where, as in the instant case, only the protected activity element is at issue, viewing the distinct possibility standard from the employer's perspective makes little sense. Such an interpretation would render the second element of a § 3730(h) claim superfluous because the definition of protected activity would include notice to the employer. And "[w]e cannot interpret a statute in a manner that would render some of its language meaningless." *Etape v. Chertoff*, 497 F.3d 379, 384 (4th Cir. 2007).

Furthermore, this interpretation would deny protection to an employee who acted reasonably if the employer happened to know additional facts that defeat the possibility of an FCA action. Such a result would certainly not be consistent with Congress's intent that the FCA shield employees who take reasonable measures to oppose fraud. Therefore, when the sole question relates to an employee's protected activity, we apply the distinct possibility standard from the perspective of the facts known by the employee at the time of the protected conduct.

III.

A.

Mann contends that he engaged in protected activity by opposing and investigating HKD's attempts to defraud the United States. But Mann cannot meet the distinct possibility standard because of one undeniable fact: there was no fraud. Therefore, based on the facts known to Mann at the time of his conduct, there was no reasonable possibility that his efforts could lead to a viable FCA action.

First we consider Mann's actions opposing HKD's bid efforts. These fall into three categories: Mann opposed HKD (1) submitting the bid, (2) using aftermarket ambilevers, and

(3) delivering the ambilevers after the close of bidding. First turning to Mann's opposition to HKD's bid submission, Mann's admission that he never read the final version of the bid until the onset of this litigation casts some doubt upon his claims. The relevant bid language states, "Ambidextrous fire control/safety lever currently not available for delivery date timeline of test weapons. It will be available if bidder is successful." Mann views this straightforward language as an attempt to fraudulently induce the United States into accepting a nonconforming bid. That may well be his sincere belief, but it is not an objectively reasonable one.

The FCA covers only "false or fraudulent" claims, and the bid language demonstrates that HKD's conduct was open and straightforward, not fraudulent. 31 U.S.C. § 3729(a)(1)(A). HKD made no effort to hide the defects in its bid. Rather, it took care to point them out so as not to deceive the United States. Indeed, the bid explicitly stated that HKD could not, at that time, meet the ambilever and trigger specifications. Thus, HKD submitted a bid free of false statements or efforts to camouflage defects. It was unreasonable, to say the least, to expect opposition to such a bid to lead to a viable FCA action.

Mann also takes exception to bid language indicating that while the ambilevers are "currently in production and available, [they] will not be available for the initial delivery date of the test weapons." Mann claims that this statement is false, a contention HKD disputes. In any event, the relevant facts under the distinct possibility standard are not what Mann now knows. Rather, they are what Mann knew at the time of the protected conduct. And Mann has failed to produce any evidence on appeal that he ever raised this issue with anyone prior to the instant litigation. Indeed, he might not even have been aware of this bid language before his termination because he had not read the final version of the bid at that time. Accordingly, Mann's newfound concerns over the "in production" language are not helpful to his claim.

Mann's actions regarding the bid submission are best characterized not as opposing fraud, but as voicing disagreement concerning the bid strategy. He entertained business concerns regarding a bid that did not meet all the requirements. But the FCA does not empower courts to adjudicate strategic business decisions and to protect the dissenters from these decisions from all consequences. *See United States ex rel. Owens v. First Kuwaiti General Trading & Contracting Co.*, 612 F.3d 724, 734 (4th Cir. 2010). The FCA's scope is commensurate with its purpose. It covers only fraudulent claims against the United States; without fraud, there can be no FCA action. Accordingly, while Mann may or may not have been correct as a matter of business strategy, his conduct falls outside the scope of the FCA.

Turning to the procurement of aftermarket ambilevers, Mann expressed concern over the quality of the ambilevers. Specifically, Mann thought the ambilevers fit too loosely on the HK-416. But HKD management disagreed and deemed the ambilevers to be of acceptable quality. Accordingly, there was a disagreement between HKD management and Mann about what component part features were most suitable for purposes of the bid.

These sorts of disagreements occur all the time, but they do not rise to the level of fraud unless there is a claim made on the public fisc that misrepresents the quality of a product in an effort to achieve an unwarranted payment for inferior goods. *See Luckey v. Baxter Healthcare Corp.*, 183 F.3d 730, 731-33 (7th Cir. 1999). Mann never identifies any instance where HKD misrepresented the quality of the ambilevers or in any way overbilled. Indeed, HKD's bid submission does not even discuss the quality of the ambilevers. Without such a misrepresentation, Mann opposed nothing more than a non-fraudulent business decision, and this cannot form the basis of an FCA action. *See Owens*, 612 F.3d at 734. If it did, FCA litigation would extend to innumerable business judgment calls that involve no fraudulent misrepresentations. And the result-

ing legal morass would serve as an impediment to productive government contracting, just as fraudulent practices unquestionably do. *Id.*

As for Mann's opposition to the delivery of the ambilevers after the close of bidding, Mann once again fails to demonstrate the existence of fraud. HKD's conduct was certainly unconventional. Indeed, it submitted the ambilevers outside of normal channels, opting to utilize a Secret Service contact and make a personal delivery. And it is undisputed that HKD made this submission after the close of bidding. Given these circumstances, HKD may have violated federal bidding regulations.

But the FCA is not concerned with bidding regulations: "Correcting regulatory problems may be a laudable goal, but one not actionable under the FCA in the absence of actual fraudulent conduct." *Hopper*, 91 F.3d at 1269; *see also United States ex rel. Conner v. Salina Regional Health Center, Inc.*, 543 F.3d 1211, 1219 (10th Cir. 2008) (holding that non-fraudulent regulatory violations are not actionable under the FCA); *United States ex rel. Siewick v. Jamieson Science & Engineering, Inc.*, 214 F.3d 1372, 1376 (D.C. Cir. 2000) (same); *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1019 (7th Cir. 1999) (same). HKD's actions were not fraudulent. It made no false statements or misrepresentations about the ambilevers during the course of the delivery. There was no effort to mislead the United States into thinking that the ambilevers were submitted on time with the bid. Indeed, HKD's bid plainly stated that the ambilevers were not available at the time it was submitted, but that they would be supplied if it won the bid.

HKD's delivery sought to demonstrate to the Secret Service that it had the ability to meet the ambilever requirement. And although recovery on a claim is not necessary to bring an FCA action, 31 U.S.C. § 3729(a)(1)(A), it is worth noting that HKD did not win the bid in question. It could not have helped

HKD's application that its submission materials forthrightly made the government aware of the nonconforming character of the bid.

It is important to refer, in the final analysis, to the purpose of the statute. As its name implies, the FCA prohibits only presenting "false or fraudulent claims for payment to the United States." *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 463 (2007). The FCA is simply not an all all-purposive directive aimed at any and every form of employment dispute. Whatever Mann's disagreements with his employer and company policy may have been, he simply fails to tie his opposition to fraudulent behavior on HKD's part. Because HKD's conduct involved no fraudulent behavior, at least insofar as this record reveals, there was no reasonable possibility that HKD's submission of the ambilevers could give rise to an FCA action.

## B.

Having found Mann's conduct opposing HKD's efforts inadequate to qualify as protected activity, we now consider Mann's investigatory activities, which include both Mann's own investigation and his participation in HKD's internal investigation.

Mann is correct that the FCA protects "investigation for" a potential FCA action. 31 U.S.C. § 3730(h). But the reason for our rejection of Mann's claim is again simple: There was no fraud. His investigatory activities, ranging from researching federal contracting regulations to asking questions of his coworkers to cooperating with HKD's internal investigation, all revolved around the very same HKD conduct that he opposed. As discussed above, during this course of conduct, HKD never made any false statements, never attempted to conceal deficiencies in its bid, and, as a result, never approached the threshold for fraud.

While it is true that protected activity takes place when "conduct reasonably could lead to a viable FCA action," Mann's investigatory activities had no reasonable prospect of uncovering fraud. *Eberhardt*, 167 F.3d at 869 (internal quotation marks and citations omitted). On the contrary, all indications were that while HKD may have proceeded maladroitly in preparing its bid, it did not conduct itself fraudulently in doing so.

As we have noted, Mann might have had a reasonable possibility of uncovering evidence that HKD violated federal contracting regulations. But even if HKD did violate these regulations by submitting a nonconforming bid and delivering the ambilevers after the close of bidding, Mann still would not qualify for FCA protection because the FCA requires fraud, not mere regulatory violations. *See Hopper*, 91 F.3d at 1269. Federal contracting regulations have their own enforcement mechanisms, and these do not include the FCA. *See id.* The penalties for violating these regulations include outright rejection of the bid and, in the event the bid is successful, termination of any contract. 4 C.F.R. § 21.8(a). HKD in fact paid a price for any violation it committed when the Secret Service rejected its bid.

## IV.

We now consider Mann's contention that the act of filing a § 3730(h) retaliation action itself qualifies as protected conduct, regardless of the nature or merits of the underlying claim. Mann insists that the text of § 3730(h) compels this conclusion. But a closer examination reveals that Mann's argument is nothing more than an attempt to skirt the deficiencies of his first § 3730(h) claim. As discussed above, Mann has not met the protected activity element of that claim, and we cannot indulge his efforts to open the back door when he could not gain entry at the front.

## A.

Mann bases his argument on what he believes to be the plain text of § 3730(h), which protects "lawful acts done by the employee . . . in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section." 31 U.S.C. § 3730(h). According to Mann, this language conclusively resolves the matter because a § 3730(h) retaliation action is "an action under this section." *Id.* But Mann reaches this interpretation only by focusing on an isolated phrase and ignoring the statutory context. The Supreme Court has made plain that "[s]tatutory language has meaning only in context," *Graham County Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 545 U.S. 409, 415 (2005), and, when read in proper context, the statute fails to support Mann's contention.

Mann relies on cases interpreting Title VII and other civil rights statutes to bolster his interpretation. *See, e.g.*, *Kubicko v. Ogden Logistics Servs.*, 181 F.3d 544 (4th Cir. 1999); *Glover v. South Carolina Law Enforcement Div.*, 170 F.3d 411 (4th Cir. 1999). But transpositional interpretation is dangerous here, all the more so because the FCA, unlike most civil rights statutes, is aimed at protecting the public fisc rather than redressing personal injuries. Add to this the fact that the Supreme Court has offered guidance on nearly identical statutory language in the FCA in *Graham County*, and we are obliged to follow the teachings of the Supreme Court interpreting this same statute.

The issue in *Graham County* was whether the statute of limitations in § 3731(b) applied to retaliation actions brought under § 3730(h). 545 U.S. at 411. Section 3731(b) provides that "[a] civil action under section 3730 may not be brought . . . more than 6 years after the date on which the violation of section 3729 [which prohibits the submission of a false claim] is committed." 31 U.S.C. § 3731(b). Much like Mann does in

the instant case, the *Graham County* plaintiff focused on a single phrase in the statute, arguing that the statute of limitations unambiguously applies because a § 3730(h) retaliation action is "[a] civil action under section 3730." *Graham County*, 545 U.S. at 415.

But the Court disagreed, explaining that "[s]ection 3731(b)(1) is ambiguous, rather than clear, about whether a § 3730(h) retaliation action is 'a civil action under section 3730.'" *Id.* A sound reading, the Court explained, was that § 3731(b)(1) applied only to §§ 3730(a) and (b) actions, that is, actions brought by the Attorney General and qui tam actions, respectively, and not to retaliation actions under § 3730(h). *Id.* at 415-17. The statutory language directing the limitations period to begin running on the date of the § 3729 violation supported this view. *Id.* at 415-16. Because a § 3729 violation was not a prerequisite to a § 3730(h) retaliation action, the statute offered no starting point for the limitations period in many § 3730(h) cases, implying that § 3731(b) was never intended to be applied to § 3730(h) actions. *Id.*

The Court resolved the matter by construing "[a] civil action under section 3730" to refer *only* to actions under §§ 3730(a) and (b) and not to retaliation actions under § 3730(h). *Id.* at 417. It came to this conclusion in part because Congress had shown elsewhere in § 3730 that it used the phrase "under section 3730" imprecisely. *Id.* at 417-18. Section 3731(c), for example, provided that "[i]n any action brought under section 3730, the United States shall be required to prove all essential elements of the cause of action, including damages, by a preponderance of the evidence." But the United States could only participate in §§ 3730(a) and (b) actions, and Congress certainly did not intend for the United States to have to prove the elements of a § 3730(h) retaliation cause of action in which it could not even participate. *Graham County*, 545 U.S. at 417-18. Therefore, Congress had demonstrated in § 3731(c) that it sometimes used the phrase "under section 3730" to refer only to actions under §§ 3730(a) and

(b), and the Court adopted this interpretation for the identical language in § 3731(b). *Id.*

## B.

*Graham County* is plainly applicable here. Similar to the provision at issue in *Graham County*, the text of § 3730 suggests that the "action under this section" language refers only to actions under §§ 3730(a) and (b), which authorize actions by the Attorney General and qui tam actions, respectively. In fact, Congress used this same phrase in § 3730(f), explaining that "[t]he Government is not liable for expenses which a person incurs in bringing an action under this section." Section 3730(f) appears to contemplate plaintiffs seeking reimbursement for expenses incurred during qui tam litigation under § 3730(b), and our sister circuits have certainly applied it in that manner. *See United States ex rel. Eisenstein v. City of New York*, 540 F.3d 94, 98 (2d Cir. 2008); *United States ex rel. Sharma v. Univ. of Southern California*, 217 F.3d 1141, 1143 (9th Cir. 2000). Accordingly, Congress used the phrase "under this section" in § 3730(f) when it intended to refer to qui tam actions.

Furthermore, § 3730(h) provides a list of examples of the type of conduct that is protected. 31 U.S.C. § 3730(h). These include "investigation for, initiation of, testimony for, or assistance in an action . . . under this section." *Id.* These categories of actions are tailored to §§ 3730(a) and (b) actions, which typically involve an employee investigating fraud, initiating a qui tam action under § 3730(b), testifying in support of that action, or assisting the United States in a § 3730(a) action. Accordingly, much like in *Graham County*, "action under this section" is best read to refer primarily to actions under §§ 3730(a) and (b).

We draw additional support from the purpose of the statute. The purpose of the FCA is to prevent fraud against the United States. *Robertson*, 32 F.3d at 951. And the purpose of its anti-

retaliation provision is to protect those employees who take actions to uncover fraud. *Id.* Courts have derived the protected activity element and its accompanying distinct possibility standard from the FCA as a way to identify those employees who oppose and investigate fraud, and not some lesser matter. *See, e.g., Dookeran v. Mercy Hosp. of Pittsburgh*, 281 F.3d 105, 108 (3d Cir. 2002); *Eberhardt*, 167 F.3d at 867-69; *Yesudian*, 153 F.3d at 740; *Hopper*, 91 F.3d at 1269; *Neal*, 33 F.3d at 864, *abrogated on other grounds by Graham County*, 545 U.S. at 416-17.

But the interpretation Mann urges would eviscerate this large body of law and open the floodgates to FCA litigation concerning a whole host of employment disputes that have little or nothing to do with fraud. In every § 3730(h) action, the employee would automatically meet the protected activity element simply by filing the anti-retaliation action. No longer would an employee need to meet the distinct possibility standard by opposing or investigating conduct that could lead to a viable FCA action. Rather, under Mann's reading of the statute, virtually any conduct could form the basis of protected activity. At a minimum, disputes over business strategy or regulatory compliance, both of which clearly fall outside the scope of the FCA, would be transformed into protected activity simply by the act of filing a § 3730(h) claim. Such a result would plainly undercut Congress's intent that the FCA remain focused upon the particular evil of fraud against the United States.

The problems with of Mann's interpretation do not end there. Under his view, a plaintiff could bring an infinite sequence of § 3730(h) claims, each one citing the filing of the previous claim as the protected conduct. The potential of such an endless and recursive chain of claims would expose employers to perpetual litigation. And because Mann's interpretation does not require even an inkling of fraud, the employee's initial retaliation action that gave rise to this litigation could be entirely baseless or even frivolous. It is

incumbent on courts to avoid outcomes this far afield of Congress's intent. *See Aremu v. Dep't Of Homeland Security*, 450 F.3d 578, 583 (4th Cir. 2006). Given these deficiencies, it is hardly surprising that Mann points to no court that has adopted his view that filing a retaliation action always qualifies as protected activity.

While Mann's interpretation is too broad, HKD and the district court counter with an equally sweeping reading of the statute, claiming that filing a retaliation action can never qualify as protected conduct. Although this interpretation avoids the problems under Mann's reading, it creates a new set of difficulties. Under HKD's view, an employer could use even the filing of a successful retaliation action as a contrived reason for termination because the act of filing a retaliation action could never be protected conduct. It would make a mockery of the FCA to have an employee prevail on the underlying retaliation action only to then be fired for the act of filing the action. More importantly, HKD's interpretation would strip § 3730(h) of any meaningful promise of protection from retaliation. And this would undermine the whole purpose of the provision, which is to encourage employees to prevent and uncover fraud against the United States.

Both Mann and HKD offer overly broad readings of the statute, framing the issue as an all or nothing proposition. But we must interpret the statute in a way that captures its meaning. To do so, it is imperative that the protected activity element remains consistent, whether the conduct at issue is the underlying opposition to fraud or the filing of the retaliation action. Therefore, if at any point an employee succeeds in showing that his actions were aimed at conduct raising a distinct possibility of fraud against the United States, then that employee will be shielded from retaliation. In this way, we keep the statute within its proper bounds, ensuring that the river does not leap its banks but, also, that the river does not run dry.

This is the same standard of protection from retaliation that courts across the country have been applying for years. *See, e.g.*, *Dookeran*, 281 F.3d at 108; *Eberhardt*, 167 F.3d at 867-69; *Yesudian*, 153 F.3d at 740-41. And it is faithful to the text and intent of § 3730(h). Employees who oppose fraud against the United States will find protection in the FCA, but those who invent frivolous actions or wander far afield may not cloak themselves in FCA protection.

## V.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.