**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 16-1805**

WILLIAM C. O'HARA,

       Plaintiff – Appellant,

and

CHARLES R. GOLDSTEIN,

       Plaintiff,

v.

NIKA TECHNOLOGIES, INC.,

       Defendant – Appellee,

------------------------------

METROPOLITAN    WASHINGTON    EMPLOYMENT    LAWYERS
ASSOCIATION,

       Amicus Supporting Appellant.

Appeal from the United States District Court for the District of Maryland, at Greenbelt.
Paul W. Grimm, District Judge. (8:13-cv-00543-PWG)

Argued: October 25, 2017               Decided: December 22, 2017

Before TRAXLER, KING, and DUNCAN, Circuit Judges.

Affirmed by published opinion. Judge Duncan wrote the opinion, in which Judge Traxler and Judge King joined.

───────────────

**ARGUED:** Jonathan Louis Gould, LAW OFFICE OF JONATHAN L. GOULD, Washington, D.C., for Appellant. Clifford Bernard Geiger, KOLLMAN & SAUCIER, P.A., for Appellee. **ON BRIEF:** Stephen Z. Chertkof, HELLER, HURON, CHERTKOF & SALZMAN, PC, Washington, D.C., for Appellant. Darrell R. VanDeusen, KOLLMAN & SAUCIER, P.A., Timonium, Maryland, for Appellee. Erik D. Snyder, PASSMAN & KAPLAN, P.C., Washington, D.C.; Richard R. Renner, KALIJARVI, CHUZI, NEWMAN & FITCH, P.C., Washington, D.C., for Amicus Curiae.

───────────────

DUNCAN, Circuit Judge:

William C. O'Hara sued his employer, NIKA Technologies, Inc., under the so-called "whistleblower-protection provisions" of the False Claims Act, 31 U.S.C. § 3730(h) and the American Recovery and Reinvestment Act (the "ARRA"), Pub. L. No. 111-5, 123 Stat. 297–99 (2009), claiming that NIKA fired him for disclosing another company's alleged fraud on the government. The district court entered summary judgment for NIKA on the first claim because it determined that § 3730(h) only protects disclosures targeting the whistleblower's employer. The court also granted NIKA summary judgment on the ARRA claim, finding that O'Hara did not genuinely dispute that NIKA would have fired him absent the disclosures. Although we hold that the district court applied the wrong legal standard to the § 3730(h) claim, we affirm its grant of summary judgment because O'Hara's disclosures are not protected under the correct legal standard either. We affirm the district court's disposition of the ARRA claim on the grounds provided below.

I.

On February 19, 2007, the National Institute of Standards and Technology ("NIST"), an agency in the U.S. Department of Commerce, awarded NIKA a contract to provide design and cost-estimating services on a project to build several new facilities at the National Center for Neutron Research (the "Project"). NIST hired another company, Northern Taiga Ventures, Inc. ("NTVI"), to perform the Project's construction work.

3

On March 5, 2007, NIKA hired O'Hara as a senior cost estimator on the Project. The parties' employment agreement stated that O'Hara would perform "work as may be requested from time to time by NIKA" and that NIKA would assign O'Hara to different projects through "WORK AUTHORIZATION forms." J.A. 186. The only work authorization form in the record shows that NIKA directed O'Hara to prepare cost estimates "as required" for the Project. J.A. 362. Because NIST funded the Project, it compensated NIKA for O'Hara's services.

At the beginning of the Project, O'Hara's primary role was to help NIST evaluate "change order proposals." As a government agency, NIST is entitled to "make changes in the work [that are] within the general scope of [a government] contract, including changes . . . [i]n the specifications (including drawings and designs) [and] [i]n the method or manner of performance of work." 48 C.F.R. §§ 52.243-4(a)(1)–(2). When the government requires a contractor to perform additional work under an existing contract, the contractor may submit a "change order proposal," requesting that the government increase the contractor's compensation to reflect the extra work. *See id.* at § 552.243-71(b). O'Hara helped NIST evaluate these requests by estimating the cost of performing the additional work.

In 2008, O'Hara submitted two reports informing Christopher Conley, a NIST manager supervising the Project, that NTVI had submitted documents to the government that O'Hara believed contained misrepresentations and inaccuracies. O'Hara's first report to Conley alleged that several of NTVI's change order proposals misrepresented

4

subcontractor quotes. The second report alleged that NTVI's construction plans contained "numerous inaccuracies." J.A. 15. When Conley disregarded these allegations, O'Hara began to forward his reports to the NIST Procurement Office and the U.S. Department of Commerce, Office of the Inspector General (the "OIG"). The OIG investigated O'Hara's claims, but it declined to charge NTVI with any misconduct.

In April 2009, NIST issued a Request for Proposals ("RFP") to which NTVI responded. RFPs "are used in negotiated acquisitions to communicate [g]overnment requirements to prospective contractors and to solicit [their] proposals." 48 C.F.R. § 15.203(a). In this instance, NIST issued an RFP soliciting bids for the construction of a concrete slab to protect a system of pipelines located under one of the cooling towers at the National Center for Neutron Research. NTVI responded to the RFP by submitting a bid. Because NTVI had an existing contract with NIST, however, its bid was submitted as a change order proposal. That is, NTVI's bid was a request that the government increase its compensation under the existing contract to reflect the additional work of installing a protective slab over the pipelines.

In May 2009, O'Hara reported to Conley that NTVI's change order proposal for the protective slab was fraudulent because the slab was unnecessary. According to O'Hara, the pipelines did not need protection because NTVI's contract required the pipelines to be replaced later in the Project. Conley disagreed. He explained to O'Hara that the protective slab was necessary because NIST would have to use the old pipelines

5

to operate the National Neutron Research Center if the Project fell behind schedule and installation of the replacement pipelines was delayed.

On October 15, 2009, NIST revised the Project's schedule. The revised schedule required NIKA, as the design contractor, to complete two sets of new designs. The schedule required NIKA to submit the designs at 35%, 50%, 95% and 100% completion. NIST would review each submission to ensure that the designs were progressing on time and according to contract specifications.

The schedule also required NIKA to submit cost estimates for each set of designs. NIST requested that the cost estimates be submitted at 35%, 50%, 95% and 100% completion as well. Each estimate was due one week after NIKA submitted the corresponding design. For example, the 35%-completed designs were due on November 3, 2009, so the 35%-completed cost estimates were due on November 10, 2009.

NIKA placed O'Hara in charge of the cost estimates for both sets of designs, but O'Hara soon fell behind schedule. He submitted the 35%-completed cost estimates on December 11, 2009, one month after the deadline. The estimates included several comments alleging that the conditions at the National Neutron Research Center did not match the site conditions described in NIKA's contract.

In a December 15, 2009 email, NIST informed NIKA that O'Hara's delay was unacceptable. NIST also complained that the estimates were not correctly formatted, did not explain many of the assumptions underlying O'Hara's calculations and included superfluous information. Regarding its last grievance, NIST explained that a cost

6

estimate was not the proper channel to raise concerns about purported inaccuracies in the contract specifications.

O'Hara responded to the December 15, 2009 email without consulting NIKA's management. His response, which was misleadingly captioned "NIKA Response," claimed that the 35%-completed estimates were "delivered within a reasonable amount of time," and that O'Hara was "compelled by professional ethics to report [inaccuracies in the designs]." J.A. 213–14. Peter Ludgate, NIKA's Vice President, reprimanded O'Hara for purporting to speak for NIKA without permission. Ludgate also informed NIST that O'Hara's response was not authorized by NIKA and assured the agency that all future cost estimates would be submitted on schedule, even if that required NIKA to hire additional cost estimators at its own expense.

The next week, O'Hara informed NIKA that he could not finish the 50%-completed estimates for both sets of designs by the deadline. To ensure that the estimates were completed on time, NIKA hired Construction Cost Systems, Inc. ("CCS")--a cost-estimating firm--to prepare one of the two sets. CCS timely submitted its portion of the estimates.

On February 19, 2010, the funds that NIST had allocated for O'Hara's position ran out. Four days later, NIKA advised NIST that CCS would prepare the remaining cost estimates because O'Hara's performance demonstrated that he could not keep up with the schedule. Accordingly, NIST decided not to allocate new funds for O'Hara's position on the Project. On February 26, 2010, NIKA fired O'Hara.

## II.

On February 20, 2013, O'Hara filed a complaint in the U.S. District Court for the District of Maryland alleging that NIKA's termination of his employment violated 31 U.S.C. § 3730(h) and § 1553 of ARRA. After discovery, NIKA moved for summary judgment on both counts.

Regarding the § 3730(h) claim, the district court held that the statute only protects a whistleblower from negative employment action when his employer had reason to know that the whistleblower was contemplating an FCA action against *the employer*. In this case, NIKA had reason to know that O'Hara was contemplating an FCA action against NTVI. But there was no genuine dispute that NIKA lacked reason to believe that O'Hara was contemplating a lawsuit against NIKA itself. The district court therefore determined that NIKA was entitled to judgment as a matter of law.

The district court also granted summary judgment on the ARRA claim, because it concluded that the undisputed facts established that NIKA would have terminated O'Hara in the absence of any whistleblowing activity. This appeal followed.

## III.

We review the district court's grant of summary judgment de novo. *See Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[W]e may affirm on any ground that the law and the record permit . . . ." *Thigpen v. Roberts*, 468 U.S. 27, 29–30 (1984).

On appeal, O'Hara argues that the district court applied the incorrect legal standard in its determination that NIKA was entitled to summary judgment on the § 3730(h) claim, because § 3730(h) protects activity that reasonably could expose or prevent fraud on the government by any person or company, not just the whistleblower's employer. O'Hara also argues that the district court erroneously entered summary judgment in favor of NIKA on the ARRA claim, because the undisputed evidence did not establish that NIKA would have terminated him in the absence of his whistleblowing activity. We address each argument in turn.

A.

First, we address O'Hara's § 3730(h) argument. We hold that the district court's conclusion that § 3730(h) only protects whistleblowing activity directed at the whistleblower's employer was erroneous, because the plain language of § 3730(h) protects disclosures in furtherance of a viable FCA action against *any person or company*. Nevertheless, we affirm the district court's grant of summary judgment because, applying the correct legal standard, we are compelled to conclude that O'Hara's disclosures were not in furtherance of a viable FCA action.

1.

First, we hold that the district court's determination that § 3730(h) only protects whistleblowing activity directed at the whistleblower's employer was erroneous, because that interpretation is at odds with the statute's plain language. Construction of a statute begins with the statute's text. *See United States v. Murphy*, 35 F.3d 143, 145 (4th Cir. 1994). "[W]here, as here, the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'" *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) (quoting *Caminetti v. United States*, 242 U.S. 470, 485 (1917)). "Courts are not free to read into the language [of a statute] what is not there, but rather should apply the statute as written." *Murphy*, 35 F.3d at 145.

The plain language of § 3730(h) reveals that the statute does not condition protection on the employment relationship between a whistleblower and the subject of his disclosures. Section 3730(h) protects a whistleblower from retaliation for "lawful acts done . . . in furtherance of an action under this section." 31 U.S.C. § 3730(h)(1). The phrase "an action under this section" refers to a lawsuit under § 3730(b), which in turn states that "[a] person may bring a civil action for a violation of [the FCA]." *Id.* § 3730(b)(1). Therefore, § 3730(h) protects lawful acts in furtherance of an FCA action. This language indicates that protection under the statute depends on the type of conduct that the whistleblower discloses--*i.e.*, a violation of the FCA--rather than the whistleblower's relationship to the subject of his disclosures.

10

The district court's construction of § 3730(h) improperly reads a limitation into the statute that does not appear in its text. As explained above, the statute describes protected activity in terms of the type of conduct disclosed by the whistleblower. It is silent regarding the relationship between the whistleblower and the subject of his disclosures. Accordingly, the district court's conclusion that § 3730(h) only protects disclosures that reveal information about the whistleblower's employer reads into statute's language a limitation that is not there.

Because the district court's interpretation of § 3730(h) contradicts the statute's plain language, we are compelled to hold that the interpretation was erroneous.[1]

2.

We nevertheless affirm the district court's determination that NIKA was entitled to summary judgment on the § 3730(h) claim. A prima facie case of retaliation under

---

[1] The district court's interpretation of § 3730(h) is premised on a survey of anti-retaliation cases, all of which involved allegations that the whistleblower suffered negative employment action because the whistleblower disclosed incriminating information about his or her employer. Several of these cases held that the whistleblower's disclosures were unprotected because they were not in furtherance of an FCA action against the employer. *See, e.g.*, *United States ex rel. Parks v. Alpharma, Inc.*, 493 F. App'x 380 (4th Cir. 2012); *McKenzie v. BellSouth Telecomms., Inc.*, 123 F.3d 935 (6th Cir. 1997). The district court misconstrued these cases to hold that an anti-retaliation suit cannot succeed unless the whistleblower discloses information about his or her employer. In reality, those cases held that the whistleblowers' disclosures were unprotected because they were not in furtherance of an FCA action. It is merely an accident of circumstance that the cases referred to the whistleblowers' employers. Therefore, we find the cases cited by the district court inapposite.

11

§ 3730(h) requires the plaintiff to prove, among other things, that he was engaged in "protected activity." *Zahodnick v. IBM Corp.*, 135 F.3d 911, 914 (4th Cir. 1997). We have previously held that this standard requires the whistleblower to demonstrate that the conduct he disclosed reasonably could have led to a viable FCA action. *Mann v. Heckler & Koch Def., Inc.*, 630 F.3d 338, 344 (4th Cir. 2010). The undisputed facts in this case demonstrate that O'Hara did not disclose any conduct that could have led to a viable FCA action. We are therefore compelled to hold that NIKA is entitled to judgment as a matter of law.

O'Hara argues that he engaged in protected activity because he revealed that NTVI attempted to charge the government for unnecessary work by submitting a bid to install a protective slab over pipelines that would be abandoned later in the Project.[2] The disclosed conduct, however, could not have led to a viable FCA action, because a contractor is not "liable for defrauding the government by following the government's

---

[2] O'Hara alludes to additional "inaccuracies" in NTVI's construction plans and prior change order proposals. But he acknowledges, in the February 20, 2013 Complaint, that "[m]any of these inaccuracies were later found to be related to and/or caused by the May 2009 protective concrete slab change order." J.A. 15–16. To the extent that some of these purported inaccuracies were not related to the change order proposal for the protective slab, O'Hara does not explain what those inaccuracies were or how they amounted to a false or fraudulent claim on the government. Such conclusory allegations do not raise a triable issue regarding O'Hara's attempt to prevent fraud on the government. *See Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002) (holding that to withstand summary judgment, the nonmoving party must produce evidence that goes beyond "[c]onclusory or speculative allegations" and relies on more than "a mere scintilla of evidence" (quoting *Phillips v. CSX Transp., Inc.*, 190 F.3d 285, 287 (4th Cir. 1999) (internal quotation marks omitted))).

explicit directions," *United States ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 289 (4th Cir. 2002) (quoting *United States ex rel. Durcholz v. FKW, Inc.*, 189 F.3d 542, 545 (7th Cir.1999)), and it is undisputed that the government directed NTVI to submit the bid in question. In fact, in a sworn affidavit to the OIG, O'Hara acknowledged that NTVI submitted its bid to construct the protective slab in response to a government RFP for a "[s]tructural [s]lab at [c]ooling [t]ower [l]ines."[3] J.A. 287.

For these reasons, there is no genuine dispute that that the government solicited the bid at issue. Accordingly, we are compelled to hold that O'Hara's disclosure was not protected because it could not have led to a viable FCA action. NIKA is thus entitled to summary judgment on the § 3730(h) claim.

B.

We also affirm the district court's grant of summary judgment on the ARRA claim because the undisputed evidence demonstrates that NIKA would have fired O'Hara absent any whistleblowing activity. The whistleblower protections under ARRA are codified at 48 C.F.R. §§ 3.907-1–7. In relevant part, these regulations prohibit employers from "discharging, demoting, or otherwise discriminating against an employee as a reprisal for disclosing covered information to . . . [a] person with supervisory authority over the employee." *Id.* § 3.907-2. Disclosed information is "covered" by ARRA if

---

[3] As we have explained, the government issues RFPs to solicit bids from potential contractors.

13

the employee reasonably believes [the information] is evidence of gross mismanagement of the contract or subcontract related to covered funds, gross waste of covered funds, a substantial and specific danger to public health or safety related to the implementation or use of covered funds, an abuse of authority related to the implementation or use of covered funds, or a violation of law, rule, or regulation related to an agency contract (including the competition for or negotiation of a contract) awarded or issued relating to covered funds.

*Id.* § 3.907-1. However, the employer is not liable if it "demonstrates by clear and convincing evidence that the non-Federal employer would have taken the action constituting the reprisal in the absence of the disclosure." *Id.* § 3.907-6(a)(2). "Evidence is clear and convincing if . . . it produces in the factfinder a firm belief or conviction as to the allegation sought to be established." 32A C.J.S. *Evidence* § 1624 (2017).

The undisputed facts establish by clear and convincing evidence that NIKA would have fired O'Hara absent any whistleblowing activity. The record shows that NIKA hired O'Hara to "[p]rovide cost estimates as required for the [Project]." J.A. 362. By the time that O'Hara was terminated, however, NIKA had been forced to hire CCS to complete several estimates because O'Hara could not complete them on time. Furthermore, NIST had complained to NIKA that it was disappointed with the quality of O'Hara's estimates, which, in addition to being late, omitted important information and were not correctly formatted. To make matters worse, O'Hara purported to speak for NIKA when he defended the quality and timeliness of his work to NIST. This prompted NIKA to clarify that O'Hara was not authorized to speak on its behalf and that it did not endorse his past performance. Finally, a few days before O'Hara was fired, NIST decided not to allocate any additional Project funds to compensate NIKA for O'Hara's

14

cost-estimating services. In light of these undisputed facts, we are left with a firm conviction that NIKA would have fired NIST absent any whistleblowing activity.

O'Hara argues that NIKA had ulterior motives for firing him, but he fails to raise a genuine dispute regarding that fact. To withstand summary judgment, the nonmoving party must produce evidence that goes beyond "a mere scintilla of evidence." *Thompson*, 312 F.3d at 649 (quoting *Phillips*, 190 F.3d at 287) (internal quotation marks omitted). Here, O'Hara contends that NIKA hired CCS to make his position unnecessary and thereby fabricate a legitimate reason to fire him. This argument, however, is contradicted by O'Hara's own admissions in the record, acknowledging that NIKA was forced to hire CCS because he required assistance to finish his estimates on time.

Accordingly, the undisputed facts establish by clear and convincing evidence that NIKA would have fired O'Hara absent any whistleblowing activity. We therefore hold that NIKA is entitled to summary judgment on the ARRA claim.

IV.

In sum, we hold that the district court erroneously concluded that § 3730(h) only protects whistleblowing activity directed at the whistleblower's employer, because the plain language of § 3730(h) protects disclosures that reasonably could lead to a viable FCA action against any person or company. NIKA is nevertheless entitled to summary judgment on the § 3730(h) claim, because O'Hara did not disclose any conduct that could have reasonably led to a viable FCA claim. NIKA is also entitled to summary judgment

15

on the ARRA claim because the undisputed facts establish by clear and convincing evidence that NIKA would have fired O'Hara absent any whistleblowing activity.  For these reasons, the judgment of the district court is

*AFFIRMED.*