**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-1722**

UNITED STATES EX REL. KEVIN CODY AND MUGE CODY,

        Plaintiff – Appellee,

v.

MANTECH INTERNATIONAL, Corporation,

        Defendant – Appellant.

**No. 17-1757**

UNITED STATES EX REL. KEVIN CODY AND MUGE CODY,

        Plaintiff – Appellant,

v.

MANTECH INTERNATIONAL, Corporation,

        Defendant – Appellee.

Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria. Anthony John Trenga, District Judge. (1:16-cv-00132-AJT-JFA)

Argued: March 20, 2018                  Decided: August 8, 2018

Before MOTZ, TRAXLER, and DIAZ, Circuit Judges.

Affirmed in part, vacated in part, dismissed in part, and remanded by unpublished opinion. Judge Traxler wrote the majority opinion, in which Judge Motz joined. Judge Diaz wrote an opinion dissenting in part.

---

**ARGUED:** Steven D. Gordon, HOLLAND & KNIGHT LLP, Washington, D.C., for Appellant/Cross-Appellee. Robert Scott Oswald, EMPLOYMENT LAW GROUP, PC, Washington, D.C., for Appellee/Cross-Appellant. **ON BRIEF:** Jessica L. Farmer, HOLLAND & KNIGHT LLP, Washington, D.C., for Appellant/Cross-Appellee. Nicholas Woodfield, John T. Harrington, Jr., EMPLOYMENT LAW GROUP, PC, Washington, D.C., for Appellee/Cross-Appellant.

---

Unpublished opinions are not binding precedent in this circuit.

TRAXLER, Circuit Judge:

Plaintiffs Kevin and Muge Cody brought this *qui tam* action against ManTech International Corporation, alleging numerous claims including retaliatory discharge in violation of both the False Claims Act ("FCA"), *see* 31 U.S.C. § 3730, and the Defense Contractor Whistleblower Protection Act ("DCWPA"), *see* 10 U.S.C. § 2409. A jury found in favor of the Codys, and awarded compensatory damages for emotional distress to Kevin in the amount of $500,000 and to Muge in the amount of $300,000. Following the verdict, ManTech moved for judgment as a matter of law under Rule 50(b) of the Federal Rules of Civil Procedure. In its motion, ManTech argued that the evidence presented at trial was insufficient to establish that ManTech terminated the Codys *because* they filed this action. ManTech further argued that the evidence was insufficient to support an award of damages for emotional distress, or, alternatively, that the emotional distress damages awarded by the jury were excessive and that the district court should have either remitted them or ordered a new trial on damages.

The district court denied the Rule 50(b) motion as to liability and upheld the jury's verdict in favor of the Codys on their retaliation claims under the FCA and the DCWPA.[1] However, the district court granted ManTech's Rule 50(b) motion "insofar as the Court f[ound] the evidence at trial insufficient to support the jury's compensatory damage

---

[1] By separate order, the district court, having upheld the jury verdict as to ManTech's liability on the retaliation claims, awarded back and front pay to both Kevin and Muge.

awards for emotional distress," J.A. 548, and vacated the award of emotional distress damages.

ManTech appeals, renewing its argument that the evidence presented at trial was insufficient as a matter of law to establish the causation element of the Codys' retaliatory discharge claims under both the FCA and the DCWPA. The Codys cross appeal the district court's partial grant of ManTech's Rule 50(b) motion, arguing that the district court erred in finding that the evidence did not support any award of damages for emotional distress. The Codys contend further that the district court compounded this perceived error by vacating this award of damages and entering final judgment rather than granting a new trial *nisi remittitur*.

As set forth in more detail below, we affirm the district court's denial of ManTech's Rule 50(b) motion as to Kevin's retaliation claims. As to Muge, however, we agree with ManTech that the evidence presented at trial was insufficient as a matter of law to establish a causal nexus between the protected activity at issue—the filing of this *qui tam* action—and her discharge from ManTech. Accordingly, we reverse the district court's denial of ManTech's Rule 50(b) motion as it relates to Muge Cody, and we vacate the verdict as to Muge, as well as the accompanying damages awarded to Muge. Finally, we also affirm the district court's order to the extent it granted ManTech's Rule 50(b) motion for judgment as a matter of law as to emotional distress damages for Kevin and vacated the jury's award of such damages. We remand this case for entry of an amended final judgment in accordance with this opinion.

## I.

We summarize the evidence in the light most favorable to Kevin and Muge, who were the non-moving parties below. ManTech is an industry-leading defense contractor specializing in the provision of "technological services" to the government of the United States. J.A. 60. Kevin started working at ManTech in 1990, rising "steadily within ManTech, eventually becoming President of the Business Unit that managed large contracts with the United States Army Tank-Automotive and Armaments Command ("TACOM") for the maintenance of Mine Resistant Ambush Protected ("MRAP") vehicles in Afghanistan and Kuwait." J.A. 548. Muge Cody began working for ManTech in 2001. The Codys met while working together at ManTech and married in 2006. Muge worked in Kevin's business unit but formally reported to another executive. Muge eventually became the program manager ("PM") for the MRAP program—an important position largely responsible for day-to-day performance on ManTech's largest contract. Both of the Codys interacted on a daily basis with the Army's contracting officer for the MRAP program and enjoyed a close working relationship with him.

*The 2011-2012 Bidding Competition for the MRAP Contract*

From the fall of 2011 to the spring of 2012, the Army conducted a bidding competition for a new 5-year contract for the maintenance of MRAP vehicles in Afghanistan and Kuwait. Kevin was on the bid proposal team tasked with securing the MRAP contract for ManTech. Specifically, Kevin was helping to develop the pricing component for ManTech's bid. Muge was likewise involved in developing certain aspects of ManTech's proposal.

5

During the bidding process, Kevin became concerned that ManTech was significantly underestimating the labor costs associated with the performance of the MRAP contract—specifically, "the amount that ManTech said it would pay its mechanics." J.A. 757. Kevin expressed his concerns to other employees working on pricing the bid during meetings and in numerous emails. Other members of the pricing team did not share Kevin's concerns, however, and the final proposal for the new MRAP contract was submitted in April 2012. At that time, Kevin sent a final email to the team reiterating that he did not concur in the pricing component of the proposal.

ManTech won the MRAP contract and, for the rest of 2012, the performance and management of the MRAP program—ManTech's largest contract—remained with Kevin's business unit. In late 2012, Kevin learned that the rates associated with the performance of the MRAP contract were being overrun—that is, the actual costs to perform the contract were greater than ManTech had estimated in developing its bid. Kevin directed that the cost overruns be investigated by his business to identify "what the issues were" and "present [them] to leadership." J.A. 1160.

*ManTech's Removal of Kevin from the MRAP Contract*

In December 2012, ManTech decided to remove Kevin as the executive overseeing the MRAP contract. Lou Addeo, who was then President of ManTech's Technical Services Group ("TSG"), met with Kevin on December 19 and informed him that he was being replaced on the MRAP contract by Mike Brogan. Kevin was told that this change, in part, was due to purported behavioral issues involving Muge. Although Muge was to remain as PM on the MRAP contract, ManTech thought it best that she

6

work outside of her husband's direct chain-of-command and report instead to Brogan. Alex Urbina, the Army's contracting officer for the MRAP contract, interacted with Muge on a daily basis and was never made aware that anyone at ManTech had any concerns about the Codys being a married couple while they worked on the same contract. He had no concerns about their relationship, and it did not affect the way they worked together.

Dan Keefe, Executive Vice President for TSG, was present at this meeting and subsequently drafted a memo summarizing the points covered in the meeting, including ManTech's stated reasons for taking management responsibility over the MRAP contract away from Kevin: (1) that Muge's "personal behavior towards her managers and the larger functional team has become unacceptable and require[s] a new management team to address," and (2) that because the MRAP contract was a "terminal" program, ManTech needed Kevin to focus on developing "new business." J.A. 1846.[2]

Addeo then met with Muge and told her that the MRAP contract and her business unit would "not be under Kevin . . . anymore" and that, as PM for the MRAP contract, she would "be reporting to Mike Brogan" from then on. J.A. 1357. Additionally, Addeo informed Muge that a deputy program manager would be appointed to assist her. Subsequently, Nate Webster was hired to serve in the newly-created position of Deputy

---

[2] In this context, a "terminal" program is one that is "mission oriented" and "unsustainable." J.A. 821. The MRAP program was a "terminal program" because it could continue only as long as troops remained at the required levels in Afghanistan and Kuwait.

7

PM for the MRAP contract. Because the Deputy PM was not an approved position under the MRAP contract, Webster had to be paid as an "indirect" employee—his salary was an overhead expense that could not be billed to the MRAP contract. J.A. 1389. At this time, ManTech was also laying off numerous employees from Muge's MRAP staff. Once the MRAP contract came under Brogan's supervision, the Army's contracting officer Urbina noticed "decreases in velocity, in management and decision-making and coordination between management." J.A. 450.

Finally, Addeo told Muge that there had been complaints about how she treated subordinates and that she would be "chang[ing] [her] behavior," but he did not identify any specific conduct that needed to be changed. J.A. 1358. Bonnie Cook, an Executive Vice President of the TSG, was present for this meeting and prepared a memorandum summarizing it. During the meetings on December 19, 2012, Addeo did not provide any details to Muge or Kevin regarding Muge's "behavioral issues" referenced in the memo he presented to her. He did not describe the specifics of any verbal complaints about her behavior; he did not present any written complaints to her; and he did not ask her to respond or provide her side of events with relation to any specific complaints. Indeed, Addeo never interviewed any of the individuals who purportedly complained about Muge Cody, and he did not order that she attend any kind of training. And Keefe never showed Muge a copy of any written complaint; did not take any notes of any conversations that he had with the people who purportedly complained about Muge; and did not share with Muge or Kevin the memo he wrote summarizing the purported December 2012 complaints against Muge.

8

In January 2013, Kevin sent an email to ManTech's Chief Compliance Officer, Terry Myers, stating, "I am concerned ManTech intends to retaliate against us because of legitimate complaints we've made about ManTech's internal/financial controls and accounting during the MRAP . . . proposal and bidding process." J.A. 1850. Muge sent a similar email to Myers, stating that she was likewise "concerned that ManTech intends to retaliate against [her] because of legitimate complaints" lodged by her and Kevin regarding ManTech's bid on the MRAP contract. J.A. 1851. In February 2013, the Codys met with Myers to discuss the concerns raised in their emails. During the meeting, Kevin articulated his belief that the removal of the MRAP contract from his Business Unit was an act of retaliation for expressing his pricing concerns during the MRAP bid proposal process.

Myers then interviewed Addeo, who stated that "[i]f [the Codys] are wrangling about the government getting screwed, they are getting paid for it." J.A. 364. He also said, "It's an offense that we let them go this far. . . . They don't care about ManTech, and they are officers of the company." J.A. 365. Addeo "didn't think they had any right to complain" given the generous compensation they had received from ManTech. J.A. 806. In short, Addeo felt that the Codys, "as officers of the company . . . were being disloyal." *Id.* Myers concluded her investigation of the Codys' allegations in May 2013 and advised them that she had found no evidence of improprieties, retaliation or financial irregularities.

*Events Following Kevin's Removal as Executive in charge of MRAP*

9

In the spring and summer of 2013, Kevin and Muge lodged several additional complaints concerning their fear of retaliation. In March and June 2013, Muge emailed Margo Mentus, Senior Vice President of Human Resources, complaining that she had been excluded from certain communications sent to the rest of her MRAP team, including her new deputy. And, in June 2013, Muge complained to Mentus that she had been bullied and harassed by various co-workers. On June 20, 2013, Kevin sent an email to Mentus in which he repeated his belief that the removal of the MRAP Contract from his Business Unit was a demotion made in retaliation for concerns he raised about the pricing of the MRAP Contract proposal.

On June 26, 2013, Keefe, who had succeeded Addeo as TSG President, met with each of the Codys about their complaints. He informed each of them that internal reviews found no evidence of compliance irregularities with respect to the MRAP proposal and no evidence of retaliation against them. Subsequently, Muge received a memo from Keefe through which she learned for the first time that there had been "over a dozen complaints" about her during the previous five-year period. J.A. 1363. No one from ManTech's Human Resources Department had ever contacted her about such complaints, which, according to Keefe, concerned unprofessional forms of workplace communication such as yelling and cursing. Army MRAP contracting officer Urbina, however, had observed Muge on a daily basis interacting with her subordinates and co-workers and had never witnessed such behavior from her. On July 12, 2013, Kevin and Muge objected to the results of ManTech's internal review in an email to Keefe.

10

In October 2013, ManTech moved Kevin completely out of his former business unit and offered him a senior vice president position in ManTech's corporate headquarters, at the same executive grade and compensation. This corporate position did not exist before Kevin filled it, apparently having been created by CFO Kevin Phillips at Keefe's direction, and the position ceased to exist following Kevin's subsequent termination. Kevin's new senior corporate VP position carried few, if any, duties and responsibilities, and Kevin learned he was essentially being asked to "oversee" tasks and assignments that already had "owners" and "were already being performed by other people." J.A. 1192.

*The Filing of the Codys' Lawsuit Under Seal*

On December 12, 2013, the Codys filed this action under seal in the Central District of California. The complaint alleged that ManTech had engaged in fraud with respect to the pricing of the MRAP Contract and that it had retaliated against the Codys for trying to prevent the fraud. Both claims were asserted under the FCA.

On April 29, 2014, Kevin complained by email about the size of his annual salary increase, his stock option award, and his bonus for 2013, and speculated that his compensation had been lowered in retaliation for his complaints about cost overruns on the MRAP contract during the initial months of contract performance. Addeo met with Kevin and took the position that Kevin's pay increase had been higher than the average for corporate executives at his pay grade, that his bonus was significantly higher than the average bonus awarded to same-grade executives, and that his stock option award matched the average award as well.

11

On June 27, 2014, Kevin met again with ManTech's CCO Myers and reiterated the complaints he made in January 2013. And, on October 7 and 31, and on December 16, 2014, Kevin sent additional emails to Myers raising new allegations of misconduct relating to ManTech's cost accounting practices. Myers investigated all of these allegations and determined that they were without merit.

Around the same time, James Maguire, a former ManTech executive, revealed to ManTech that he had been contacted by an investigator from the Department of Defense Office about the pricing on the MRAP contract. Phillips and Keefe assumed "either one of the Codys had made a complaint, or if the Codys may have had a complaint to one of their customers, the customer may have made the complaint." J.A. 1488.

*Events After the Codys' Lawsuit was Unsealed*

On November 21, 2014, after the United States declined to intervene in the action, the complaint was unsealed. ManTech, however, did not learn about the lawsuit until December 23, 2014, when counsel for the Codys sent a letter to ManTech directing it to preserve any evidence related to the Codys' claims that ManTech violated the FCA. ManTech was served with a copy of the complaint on January 8, 2015.

On January 12, 2015, ManTech notified the Codys that it was conducting an internal investigation of the FCA violations alleged in their complaint. ManTech retained an outside expert in cost accounting and regulatory compliance to review the issues raised in the Codys' *qui tam* action. Phillips, who was "[d]isappointed but not surprised" about the lawsuit, J.A. 1490, testified that from a business perspective, ManTech "wanted to make sure that [they] set up a [communication] plan to talk to [their] customers" and

12

"let them know what ManTech had done through this period to try to make sure there were no issues and let them know that [they] were doing everything [they] could to ensure there was no improper action that would have been done to the government," J.A. 1491. And because the lawsuit was now in "the public domain," they were also concerned with developing "an external press and reputational plan." J.A. 1491. With regard to the lawsuit itself, Phillips made the decision that Muge "could not represent ManTech as the program manager . . . to the very customer that she was saying that ManTech had defrauded," and that Kevin should not be "in the corporate office with . . . the same team that had to . . . address these legal issues" raised in the lawsuit. J.A. 1492. ManTech placed both Codys on paid administrative leave during the pendency of the internal investigation and until further notice. Webster was made the acting Program Manager for the MRAP Contract while Muge was on leave. No one was appointed to fill Kevin's position.

Because of cutbacks in the defense budget and the withdrawal of American troops from Afghanistan, ManTech's revenues declined by 45%—from $2.9 billion in 2012 to $1.55 billion in 2015. During that two-year period, ManTech discharged 35 employees at corporate headquarters as well as others at its operating divisions. These terminations included a total of 14 corporate officers.

On March 8, 2015, Kevin learned that he would be terminated effective March 20, 2015. Phillips testified that Kevin was terminated, along with a number of other senior executives, due to a sharp decline in ManTech's revenue caused by the United States'

drawdown of troops in Afghanistan. Following Kevin's termination, Muge remained on administrative leave.

On June 17, 2015, ManTech informed Muge that she would be terminated effective July 1, 2015. Brogan testified that ManTech terminated Muge because the Army eliminated her MRAP contract program manager position.[3] Cook testified that she had "never seen the government eliminate the program management position from a contract and certainly not from a large contract. It's a very important position." J.A. 1024. ManTech requested reconsideration of the decision to eliminate the position, but the Army denied the request. On June 16, 2015, ManTech received a formal contract modification from the Army that eliminated the Program Manager position from the MRAP Contract as of June 30, 2015.

*Amended Complaint, Trial and Verdict*

On February 25, 2016, ManTech moved to dismiss Plaintiffs' original complaint. In response, the Codys filed their First Amended Complaint on March 16, 2016, in which they abandoned the *qui tam* claim for violation of the FCA. In their Amended Complaint, the Codys continued to assert a retaliation claim under the FCA, *see* 31 U.S.C. § 3730(h), and added a second retaliation claim under the DCWPA, *see* 10 U.S.C. § 2409. The Amended Complaint also added factual allegations based on events since

---

[3] The MRAP Contract required a Program Manager and provided the funding for that position. When Muge was placed on paid administrative leave in January 2015, her time could no longer be charged to the MRAP Contract and, instead, became an overhead cost borne by ManTech.

the filing of the original Complaint, notably ManTech's discharge of Kevin in March 2015 and its discharge of Muge in June 2015.

Following discovery, ManTech moved for summary judgment, which the district court granted in part on September 14, 2016. The district court concluded that the only protected activity in which the Codys had engaged was the filing of this suit, and it dismissed all of the Codys' claims for retaliation to the extent they were based on any other whistleblowing conduct. Accordingly, "the only issue for the jury to decide with respect to liability was whether there was sufficient causation between the filing of this *qui tam* action and Plaintiffs' respective terminations." J.A. 550. Additionally, before trial, "the parties stipulated to the amount of back-pay damages each Plaintiff would be entitled to receive should they prevail on the issue of liability and also agreed that in the event of liability, the issue of front pay was for the Court to decide." *Id.* That left "compensatory damages for emotional distress as the only damages issue for the jury to decide." *Id.*

As to liability, the jury returned a verdict in favor of both Codys, finding that ManTech unlawfully terminated the Codys in retaliation for their filing of this *qui tam* action. As to damages for emotional distress, the jury awarded $500,000 to Kevin Cody and $300,000 to Muge Cody.

After the Codys presented their case-in-chief, ManTech moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a). ManTech renewed its motion pursuant to Fed. R. Civ. P. 50(b) at the close of all evidence. The district court reserved ruling on these motions until after the jury verdict. The district court then granted ManTech's

15

motion in part, vacating the jury's damage awards for emotional distress for insufficient evidence. The district court denied ManTech's motion as to liability, upholding the jury's conclusion that ManTech retaliated against both Kevin and Muge Cody. The district court entered awards of back pay and front pay to each of the Codys and entered final judgment.

## II. ManTech's Appeal

We turn first to ManTech's challenge to the district court's denial of its motion for judgment as a matter of law under Rule 50(b). ManTech contends that the Codys did not present sufficient evidence to establish retaliatory discharge under either the FCA or the DCWPA. More specifically, ManTech asserts that the Codys failed to demonstrate a causal nexus between their protected activity—the filing of this *qui tam* action—and ManTech's termination of their employment.

## A. Standard of Review

In order "[t]o challenge the sufficiency of the evidence in a civil jury trial on appeal, a party must comply with Federal Rule of Civil Procedure 50," which "sets out two different stages for such a challenge." *Belk, Inc. v. Meyer Corp., U.S.*, 679 F.3d 146, 154 (4th Cir. 2012). First, "Rule 50(a) allows a party to challenge the sufficiency of the evidence before a case is submitted to the jury." *Id.* Second, Rule 50(b) "sets forth the requirements for challenging the sufficiency of the evidence after the jury verdict and entry of judgment." *Id.* at 155. In either case—whether the moving party is asserting a Rule 50(a) motion or a post-verdict Rule 50(b) motion—a motion under this rule "tests the legal sufficiency of a claim, that is, *assesses whether* the claim should succeed or fail

16

because *the evidence developed at trial was insufficient as a matter of law to sustain the claim.*" *Id.* (emphasis added); *see Cowart v. Erwin*, 837 F.3d 444, 450 (5th Cir. 2016) ("When a case is tried to a jury, a [renewed] motion for judgment as a matter of law is a challenge to the legal sufficiency of the evidence supporting the jury's verdict." (internal quotation marks omitted)).[4]  Our review of the denial of a Rule 50(b) motion is de novo, and we apply the same standard used by the district court.  *See First Union Commercial Corp. v. GATX Capital Corp.*, 411 F.3d 551, 556 (4th Cir. 2005).  That is, this court must affirm the jury's verdict, "[i]f, viewing the facts in the light most favorable to the non-moving party, there is sufficient evidence for a reasonable jury to have found in the non-moving party's favor." *Id.* (internal quotation marks and alteration omitted).

## B.  The Elements of the Codys' Retaliation Claims

### 1.  Retaliation under the FCA

The general purpose of the FCA is to combat fraud against the federal government.  *See Mann v. Heckler & Koch Def., Inc.,* 630 F.3d 338, 349 (4th Cir. 2010).  The FCA's *qui tam* provisions achieve this purpose "quickly and efficiently by encouraging relators to bring actions that the government cannot or will not." *United States ex rel. Sanders v. N. Am. Bus Indus., Inc.*, 546 F.3d 288, 295 (4th Cir. 2008); *see*

---

[4] The relevant portion of Federal Rule of Civil Procedure 50(b) provides that "[i]f the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion."  Fed. R. Civ. P. 50(b).  Rule 50(b) thus incorporates the standard for granting judgment as a matter of law set forth in Rule 50(a)—whether there is "a legally sufficient evidentiary basis" for "a reasonable jury" to "find for the party on [an] issue."  Fed. R. Civ. P. 50(a).

17

*Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013) ("Under the FCA, private parties can bring qui tam actions in the name of the United States to enforce the provisions of the statute."). "[T]he paradigm qui tam case is one in which an insider at a private company," who is "privy to a fraud on the government," brings suit against his employer "blow[ing] the whistle on the [fraud]." *United States ex rel. Fine v. Chevron, U.S.A., Inc.*, 72 F.3d 740, 742 (9th Cir. 1995) (en banc) (internal quotation marks omitted).

In order to protect "employees who take actions to uncover fraud," Congress included in the FCA an anti-retaliation provision. *Mann*, 630 F.3d at 349. The anti-retaliation provision thus affords a cause of action to "[a]ny employee . . . discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . in furtherance of an action under this section." 31 U.S.C. § 3730(h)(1). This provision was added in view of the likelihood that "few individuals will expose fraud if they fear their disclosures will lead to harassment, demotion, loss of employment, or any other form of retaliation." *Mann*, 630 F.3d at 343 (internal quotation marks omitted). Accordingly, through § 3730(h), Congress "create[d] a cause of action for employees who suffer retaliation for taking measures to prevent contractor fraud against the United States." *Id.*

Retaliation claims can be proven by either the submission of direct evidence of retaliatory animus or by use of the *McDonnell Douglas* burden-shifting framework.[5] *See*

---

[5] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

*Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015). Although the Fourth Circuit has not explicitly held that the *McDonnell Douglas* burden-shifting framework applies to retaliation cases under the FCA or DCWPA, we have applied it to retaliation claims available under similar statutes, *see, e.g., id.* (retaliation claim under Title VII), and we see no reason that this framework would not apply in this context as well. Moreover, other circuits and district courts in this circuit have routinely applied the framework to FCA retaliation claims. *See, e.g., Diaz v. Kaplan Higher Educ., L.L.C.*, 820 F.3d 172, 175 n.3 (5th Cir. 2016) ("We . . . apply the *McDonnell Douglas* framework to the False Claims Act's anti-retaliation provision."); *Harrington v. Aggregate Indus.—N.E. Region, Inc.*, 668 F.3d 25, 31 (1st Cir. 2012) ("We hold . . . that the FCA's anti-retaliation provision is amenable to the use of the *McDonnell Douglas* framework."); *United States ex rel. Schweizer v. Océ N.V.*, 677 F.3d 1228, 1241 (D.C. Cir. 2012) (concluding that "the *McDonnell Douglas* framework applies to § 3730(h) retaliation claims").

In order to establish a prima facie case of retaliation under § 3730(h), the plaintiff must prove the following: (1) that "he engaged in 'protected activity' by acting in furtherance of a qui tam suit;" (2) that "his employer knew of these acts;" and (3) that a causal link exists—that "his employer took adverse action against him *as a result* of these acts." *Glynn*, 710 F.3d at 214 (emphasis added). As noted, the final element of an FCA retaliation claim encompasses a causation requirement pursuant to which the plaintiff must establish a causal nexus between the alleged protected activity and the alleged adverse employment action. ManTech contends that this element requires a plaintiff to

satisfy a "but-for" causation standard. *See, e.g.*, *United States v. Solvay Pharm., Inc.*, 871 F.3d 318, 333 (5th Cir. 2017) (per curiam) (explaining plaintiffs asserting claims under the anti-retaliation provision of the FCA "must point to evidence creating a genuine issue of material fact that their complaints were the but-for cause of their terminations"). Although the district court, in ruling on ManTech's Rule 50(b) motion, stated that it "appears to be an open question" whether "the causation standard for FCA retaliation claims is a 'but-for' standard" or "a 'contributing factor' standard," J.A. 552 n.1, the Codys do not in fact challenge on appeal ManTech's position that a retaliation claim under the FCA requires "but for" causation.[6]

The FCA anti-retaliation provision affords relief to an employee who "is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment *because of* lawful acts done by the employee . . . in furtherance of an action under this section." 31 U.S.C. § 3730(h)(1) (emphasis added). This court has not squarely addressed whether the FCA's "because of" requirement imports a "but-for" causation standard. We are guided, however, by two Supreme Court decisions considering the use of this same language in similar statutes. The first is *Gross v. FBL Financial Services, Inc.*, which held that

---

[6] The district court cited *Pencheng Si v. Laogai Research Foundation*, 71 F. Supp. 3d 73, 101 (D.D.C. 2014), as an example of courts concluding that an FCA retaliation claim requires only "contributing factor" causation. *See also United States ex rel. Schweizer v. Océ N.V.*, 677 F.3d 1228, 1238 (D.C. Cir. 2012) (asking, for purposes of an FCA retaliation claim, whether "the employer's adverse action against the employee [was] motivated, at least in part, by the employee's engaging in [that] protected activity") (internal quotation marks omitted).

Congress's use of the phrase "because of" in the anti-retaliation provision of the Age Discrimination in Employment Act (ADEA) requires a "'but-for' cause of the employer's adverse decision." 557 U.S. 167, 176 (2009). The second is *University of Texas Southwest Medical Center v. Nassar*, in which the Court considered the causation component of Title VII's anti-retaliation provision. *See* 570 U.S. 338, 352 (2013). The Court explained that, "[g]iven the lack of any meaningful textual difference between the text in this statute and the one in *Gross*, the proper conclusion here, as in *Gross*, is that Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Id*. We perceive no appreciable difference between the "because of" language used in the anti-retaliation provision before us today and that considered in *Gross* and *Nassar*. We are convinced therefore that a retaliation claim under the FCA requires proof of "but for" causation. This court has previously applied *Gross* and *Nassar* in the same way, holding that the Americans with Disabilities Act's "*on the basis of*" language "calls for a 'but-for' causation standard" as there is "no 'meaningful textual difference' between this language and the terms 'because of,' 'by reason of,' or 'based on'—terms that the Supreme Court has explained connote 'but-for' causation." *Gentry v. E. W. Partners Club Mgmt. Co.*, 816 F.3d 228, 235-36 (4th Cir. 2016) (quoting *Nassar*, 570 U.S. at 352). And, our conclusion is consistent with the majority position of the circuit courts of appeal which construes FCA's "because of" language to require "but for" causation. *See, e.g., DiFiore v. CSL Behring, LLC*, 879 F.3d 71, 78 (3d Cir. 2018); *Solvay Pharm.*, 871 F.3d at 333; *United States ex rel. Marshall v. Woodward, Inc.*, 812 F.3d 556, 564 (7th Cir. 2015).

21

Assuming the plaintiff establishes a prima facie case of retaliation under the FCA, a presumption of retaliation arises, and the burden then shifts to the employer to show that it had a legitimate non-retaliatory basis for its actions. *See Foster*, 787 F.3d at 250. If the employer makes this showing, the presumption vanishes and the burden shifts back to the plaintiff to rebut the employer's evidence by demonstrating that the employer's purported nonretaliatory reasons "were not its true reasons, but were a pretext for discrimination." *Id.* (internal quotation marks omitted). Stated differently, the plaintiff must show the articulated reason is false *and* "that retaliation was the real reason for the challenged conduct." *Id.* at 252 (alteration omitted). At bottom, a plaintiff's ultimate burden as to causation is the same under either means of proof: she must show that the "unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* at 249 (internal quotation marks omitted). In a direct-evidence case, the plaintiff meets her ultimate burden as part of the prima facie case of providing "but-for" evidence of causation, by showing that she would not have been subjected to the adverse employment action "but for her employer's retaliatory animus." *Id*. at 252 (internal quotation marks omitted). In a burden-shifting case, she meets her ultimate burden at the third stage of the analysis by showing pretext. *See id.* at 250, 252. In other words, "[a] plaintiff who can show that retaliation was the real reason for the adverse employment action will necessarily be able to show that the harm would not have occurred in the absence of—that is, but for—the defendant's conduct." *Id.* at 252 (alteration, citation, and internal quotation marks omitted).

2. Retaliation under the DCWPA

22

The DCWPA prohibits retaliation against employees of defense contractors who report certain types of misconduct. *See* 10 U.S.C. § 2409(a)(1). Under this statute, "[a]n employee of a contractor [or] subcontractor . . . may not be discharged, demoted, or otherwise discriminated against as a reprisal for disclosing . . . information that the employee reasonably believes is evidence of . . . [g]ross mismanagement," "gross waste of Department funds," "abuse of authority," or "a violation of law, rule, or regulation related to" a Department of Defense contract or grant. *Id.* Protection under the DCWPA covers disclosures to "[a] Member of Congress," "[a]n Inspector General," and "[a] management official or other employee of the contractor . . . who has a responsibility to investigate, discover, or address misconduct," among others. 10 U.S.C. § 2409(a)(2).

The DCWPA incorporates "[t]he legal burdens of proof specified in section 1221(e) of title 5" and makes them "controlling for the purposes of any . . . judicial or administrative proceeding to determine whether discrimination prohibited under this section has occurred." 10 U.S.C. § 2409(c)(6). The difference between a retaliation action pursuant to this provision and one under the FCA is that, under this framework, a plaintiff must only establish that retaliation for a protected disclosure "was a contributing factor" to any adverse personnel action taken against the plaintiff. 5 U.S.C. § 1221(e)(1). "A contributing factor is any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision." *Feldman v. Law Enf't Assocs. Corp.*, 752 F.3d 339, 348 (4th Cir. 2014) (internal quotation marks omitted).

### 3. Effect of Jury Instructions on Causation Standard for Challenge to Denial of Rule 50(b) Motion for Judgment as a Matter of Law

23

As we noted previously, the Codys do not dispute that a retaliation claim under the FCA, in fact, requires but-for causation. Rather, the Codys argue that ManTech "waived" the right to insist upon this standard when challenging the denial of its Rule 50 motion.

At trial, the district court instructed the jury on causation using the more forgiving "contributing factor" standard for both claims—as agreed upon by the parties.[7] In its post-trial Rule 50(b) motion for judgment as a matter of law, however, ManTech argued that the Codys failed to establish their retaliation claims under the FCA because they did not submit evidence from which a reasonable jury could find by a preponderance of evidence that the filing of this action "was the 'but-for' cause of their terminations, and not simply a motivating factor." J.A. 206. According to ManTech, it agreed that, to avoid jury confusion, only the more lenient "contributing factor" causation standard should be charged as to both the FCA and DCWPA retaliation claims. In its post-verdict motion for judgment as a matter of law, however, ManTech contended that the "but for" standard still applied for purposes of assessing the sufficiency of the evidence for the FCA retaliation claim. J.A. 206.

The district court rejected ManTech's argument that the sufficiency of the evidence to support the FCA retaliation claim should be assessed under a "but for"

---

[7] The district court charged that "the plaintiff must prove by a preponderance of the evidence that his or her protected activity was a contributing factor in the defendant's decision to discharge him or her," and explained that "[a] contributing factor is any factor which alone or in combination with other factors tends to affect in any way the outcome of the decision." J.A. 1534-35.

causation standard, concluding that ManTech had agreed to the "contributing factor" instruction and had therefore "waived any objection to the jury instructions on causation." J.A. 552 n.1. The Codys largely adopt this position on appeal, contending that "under the 'invited error' doctrine, ManTech waived the right to have the jury find whether retaliation was the 'but for' cause of the Codys termination." Brief of Appellee/Cross-Appellant at 49.

In response, ManTech explains that it is *not* challenging the jury instructions on appeal, and that in its Rule 50 motions, it noted that "differing standards of proof apply in assessing the sufficiency of the evidence to support retaliation claims under the FCA and the DCWPA." Reply Brief of Appellant/Brief of Cross Appellee at 5. ManTech claims that the district court decided to reserve ruling on the Rule 50 motions until after the verdict, and that ManTech then agreed at that point that the "more lenient" contributing-factor standard should be used to instruct the jury on both claims to avoid confusion. *Id.* According to ManTech, by agreeing to simplify the jury instructions on causation, it did not waive its Rule 50 argument that the evidence of causation was insufficient to establish the Codys' retaliation claims under either the FCA or the DCWPA.

Despite the surface appeal of the Codys' position, we agree with ManTech that when a party challenges a district court's ruling on a motion for judgment as a matter of law, the jury instructions given do not control our analysis. Our focus in this instance is on whether the district court properly ruled on ManTech's Rule 50(b) motion—whether or not a party objects or consents to a given instruction has no bearing on this inquiry. As the Supreme Court has explained, "the failure to object to an instruction does not render

25

the instruction the law of the case for purposes of appellate review of the denial of a directed verdict or judgment notwithstanding the verdict." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 120 (1988) (internal quotation marks omitted). "If a party moves under Rule 50 for judgment as a matter of law both before and after the verdict," as ManTech did here, "the motions are sufficient to preserve the issue for appeal," regardless of the jury instructions. *Fisher v. City of San Jose*, 509 F.3d 952, 958 n.4 (9th Cir. 2007) (internal quotation marks and ellipses omitted), *vacated on other grounds*, 558 F.3d 1069 (9th Cir. 2009) (en banc). Put differently, "when reviewing a motion for judgment as a matter of law, we apply the law as it should be, rather than the law as it was read to the jury." *Pincay v. Andrews*, 238 F.3d 1106, 1109 n.4 (9th Cir. 2001). Accordingly, we turn to consider the legal sufficiency of the Codys' retaliation claims. In doing so, we apply a but-for causation standard to their FCA retaliation claims, but a contributing-factor causation standard to their DCWPA retaliation claims.

### C. Sufficiency of the Codys' Evidence

#### 1. Kevin Cody

ManTech contends that the Codys can point to no evidence establishing causation other than the temporal proximity between ManTech's learning of the *qui tam* action and the terminations of Kevin and Muge Cody. And, ManTech argues, even the evidence of temporal proximity here is insufficient to give rise to a reasonable inference of retaliation because the time gap is too great between ManTech's notice of the Codys' lawsuit and their subsequent terminations. Generally, the temporal nexus between two events does not alone give rise to an inference of causation. For that to happen, the "temporal

26

proximity between an employer's knowledge of protected activity and an adverse employment action" must be "very close." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam) (internal quotation marks omitted). In this case, the time gap for Kevin was approximately ten weeks; for Muge, six months.

The Codys, however, do not rely solely on temporal proximity to establish causation, and the district court concluded that the Codys offered enough other evidence to establish causation. In particular, the district court found that evidence relating to the Codys' administrative leave, as well as the acrimonious pre-suit history between the Codys and ManTech with regard to the MRAP bidding process, was probative of ManTech's "retaliatory motivation." J.A. 553. We agree.

It is undisputed that ManTech placed the Codys on administrative leave immediately after learning of the *qui tam* action. Evidence in the record established that, as a practical matter, being placed on administrative leave at ManTech imposed "consequences within ManTech's organizational structure, including [the Codys'] ability to transfer to other positions." J.A. 553. Moreover, the record supports a reasonable inference that placing the Codys on administrative leave relieved ManTech of having to comply with its company policy of attempting to find alternative positions for employees facing layoffs.

ManTech argues that no retaliatory animus can be inferred from placing an employee on paid administrative leave because it is well-established that doing so does not constitute an adverse employment action. *See, e.g., Jones v. Southeastern Pa. Transp. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015). As noted by the district court, however,

27

"the issue is not whether that administrative leave constitutes an adverse employment practice, but whether it can be probative of ManTech's retaliatory intent in this context." J.A. 553.

As far as the evidence of the acrimonious relationship between the Codys and ManTech that existed before ManTech received notice of the lawsuit, the district court rejected ManTech's position that none of it could be used to establish causation because this evidence concerned events that occurred prior to the Codys' protected activity. Relying on *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299 (4th Cir. 2006), ManTech argues on appeal that retaliatory animus can never be based on evidence of events that occurred before the protected activities at issue. *Francis* establishes no per se rule, however, that history of a prior antagonistic relationship is irrelevant. In *Francis*, we simply concluded, under the facts of that case, that no retaliatory inference could be drawn solely from the temporal proximity of the protected activity and discharge more than two months later where "[t]he actions that led to [plaintiff's] probation and termination began *before* her protected activity." *Id.* at 309. Likewise, in *Feldman*, also relied upon by ManTech, this court noted no per se rule against consideration of prior acrimony between the plaintiff and his employer. *Feldman* suggests that when animus already exists between the plaintiff and his employer prior to the protected activity at issue, the plaintiff needs to be able to show that his protected conduct "changed" the "status quo" in some fashion. 752 F.3d at 349.

The evidence unquestionably established that prior to the lawsuit, ManTech harbored animus towards the Codys for their questioning of the reliability and accuracy

28

of ManTech's bid submitted to the government. The Codys presented evidence that during the MRAP bidding process, ManTech downplayed the expected labor costs to perform the contract. Kevin was concerned about deflated estimated labor costs being included in ManTech's MRAP bid proposal, and he expressed this concern to ManTech management frequently in late 2012 and early 2013. After winning the contract, ManTech in fact experienced cost overruns as it performed the MRAP contract, and Kevin expressed concerns about this as well. Leadership within ManTech's Technical Services Group characterized the Codys' complaints as "disloyal," J.A. 806, and concluded that the Codys had no right to complain about "the government getting screwed," J.A. 364, in light of the substantial compensation both Kevin and Muge were earning from the performance of a government contract.

> Based on all of the evidence taken as a whole, the district court concluded it was

> reasonable for the jury to infer that this lawsuit, as the culmination of the dispute between the Codys and ManTech, was the last straw for ManTech and that ManTech placed the Codys on administrative leave without any intention to ever allow them to return to work, an intention further reflected in ManTech's decision not to afford either an opportunity to be considered for other positions in ManTech despite . . . [ManTech's] emphasis on attempting to find other positions for employees who may otherwise be terminated.

J.A. 554. We agree with the district court that the evidence was sufficient to establish a prima facie case of retaliation for both Kevin and Muge under both the FCA and the DCWPA.

With respect to Kevin, ManTech introduced evidence to show that his termination was caused by sharply declining revenues at ManTech resulting from the drawdown of

29

American troops in Afghanistan and cutbacks in defense spending. ManTech took steps to reduce overhead in 2014 and 2015, including terminating 35 employees assigned to corporate headquarters, where Kevin was also assigned. In September 2014, ManTech determined that unless it brought in substantial new business, Kevin, an indirect employee not assigned to a specific contract, would have to be terminated. On March 20, 2015, Kevin was terminated. ManTech laid off two other senior corporate officers in addition to Kevin. This explanation provided by ManTech officials at trial is sufficient to establish a cogent, non-retaliatory basis for the adverse employment action it took against Kevin. However, as the district court observed, "ManTech offered no corroboration for their testimony, such as internal documents reflecting that such a decision had, in fact, been made," J.A. 555, and the jury was not obliged to accept this explanation. They could have, but they did not. We agree that, in view of the record as a whole, the evidence was sufficient to permit a reasonable jury to accept a contrary view and conclude that Kevin would not have been terminated absent the lawsuit under both the FCA's but-for standard as well as the more lenient contributing-factor standard imposed by the DCWPA.

## 2. Muge Cody

With respect to Muge, however, the evidence leads to a different conclusion. We must evaluate each plaintiff's retaliation claim on its own distinct facts even when the facts of multiple plaintiffs' claims are similar. *See, e.g.*, *Bland v. Roberts*, 730 F.3d 368, 384–89 (4th Cir. 2013) (concerning actions taken in retaliation for exercise of First Amendment rights). The evidence is uncontradicted that the Army, and not ManTech,

30

made the unilateral decision to eliminate Muge's position on the MRAP account. On April 21, 2015, while Muge was still on administrative leave pending ManTech's internal investigation of the FCA violations alleged in the complaint, the Army notified ManTech that it was modifying the MRAP contract to eliminate the PM position. In late April, ManTech sent a letter requesting reconsideration of this decision, but the request was denied. On June 16, 2015, ManTech received a formal contract modification notice indicating that the MRAP Program Manager position would no longer exist as of June 30, 2015. The following day, ManTech notified Muge that her employment would be terminated on July 1, 2015.

In our view, Muge is situated much differently than Kevin. Assuming Muge established a prima facie retaliation case under the DCWPA, ManTech nonetheless established through the foregoing evidence that it would have taken the same personnel action in the absence of the protected activity, as required by the DCWPA. *See* 5 U.S.C. § 1221(e)(2). The temporal gap between Muge's protected activity and her termination was six months – much longer than Kevin's gap. When ManTech finally terminated Muge, it was only after the Army had unilaterally decided to eliminate her position and after ManTech had sought unsuccessfully to have the Army reverse its decision to eliminate her position. And, ManTech's decision to terminate Muge—as well as acting PM Nate Webster—immediately after receiving the formal contract modification notice from the Army suggests strongly that the decision to terminate Muge and Webster was based solely on the Army's elimination of the PM position. Thus, while ManTech opted not to replace Kevin at corporate headquarters after terminating him, ManTech played no

31

role in the elimination of Muge's job and even expressed disagreement with the decision. There is no evidence whatsoever to question the Army's motivation or to connect it in any way with the controversy between the Codys and ManTech, nor is there any evidence that Muge would have been retained by ManTech even after the Army had eliminated her job, particularly given the economic straits in which ManTech found itself at the time.

Additionally, the motive to retaliate was greater with respect to Kevin than Muge. Although Muge apparently shared Kevin's views that the company was retaliating against them for Kevin's grievances regarding the MRAP bid, Kevin was unquestionably the primary complainant stirring the pot about the accuracy and honesty of ManTech's bid.

As for Muge's retaliation claim under the FCA, we conclude based on the foregoing recitation of the evidence, even viewed in a light most favorable to Muge, that no reasonable finder of fact could conclude that "the harm would not have occurred in the absence of—that is, but for—the defendant's conduct." *Foster*, 787 F.3d at 252 (internal quotation marks omitted). Likewise, we conclude that even under DCWPA's more lenient "contributing factor" standard, the evidence is insufficient as a matter of law to permit Muge to establish a retaliation claim. Accordingly, we reverse the district court's denial of ManTech's Rule 50(b) motion with respect to Muge's retaliation claims under both the DCWPA and the FCA and vacate the jury's verdict as to both claims.

### III. Kevin Cody's Cross Appeal

We turn now to the cross appeal challenging the district court's order vacating the jury verdict to the extent it awarded damages for emotional distress to Kevin Cody in the

amount of $500,000.[8]  Kevin challenges both the district court's conclusion that the evidence was insufficient as a matter of law to support any damages for emotional distress and the court's failure to order a new trial *nisi remittitur* in the alternative.  We reject both of these challenges and affirm the district court's ruling.

Because Kevin's cross appeal concerns the district court's granting of ManTech's Rule 50(b) motion with respect to the emotional distress damages, we apply a *de novo* standard of review, *see GATX Capital*, 411 F.3d at 556, rather than, as Kevin suggests, the abuse of discretion standard applicable to a motion for a new trial *nisi remittitur* under Rule 59(a) of the Federal Rules of Civil Procedure, *see Sloane v. Equifax Info. Servs., LLC*, 510 F.3d 495, 502 (4th Cir. 2007).  The district court determined that the Codys "failed to present evidence of demonstrable, genuine, and adequately explained emotional distress," and that "the jury's verdict [was] based on nothing more than an inference that emotional distress accompanied Plaintiffs' termination."  J.A. 561 (internal quotation marks omitted).  Kevin contends this conclusion was erroneous, but he fails to point to any specific evidence in the record of emotional distress that resulted from his termination.  Kevin highlights his own testimony that it was upsetting when, in the months following his termination, he had to drive past ManTech signs to his new place of employment—the signs served as a reminder that he still "should [have been] at one of those ManTech offices . . . running a successful business" rather than "hav[ing] been

---

[8] In view of our decision to vacate the verdict in favor of Muge Cody as to liability, her challenge to the district court's ruling vacating the award of emotional distress damages is now moot and we need not address it.

pushed aside." J.A. 1203. Muge testified that she and Kevin were long-time employees who desired to work their entire career and retire at ManTech, implying that this long-term relationship made termination all the more upsetting.

We agree with the district court that this evidence was wholly insufficient to support an award of damages for emotional distress. "An award of compensatory emotional distress damages requires evidence establishing that the plaintiff suffered *demonstrable* emotional distress, which must be sufficiently *articulated*; neither conclusory statements that the plaintiff suffered emotional distress nor the mere fact that a violation occurred supports an award of compensatory damages." *Doe v. Chao*, 306 F.3d 170, 180 (4th Cir. 2002) (emphasis added) (internal quotation marks and alterations omitted), *aff'd*, 540 U.S. 614 (2004). Kevin did not offer testimony or other evidence specifically detailing how he suffered emotional distress because of his termination—he and Muge testified in conclusory fashion, indicating generally that he was upset and felt embarrassed or disrespected. Such general terms, without more, are insufficient to create an "issue of material fact for the jury regarding the presence of compensable emotional distress." *Id.* ("A plaintiff's own conclusory allegations that he felt 'embarrassed,' 'degraded,' or 'devastated,' . . . will not suffice to create a disputed issue of material fact for the jury regarding the presence of compensable emotional distress."). Moreover, the record is devoid of any evidence that Kevin manifested physical symptoms of his purported emotional distress or that he sought medical or psychiatric aid for emotional distress. *See Knussman v. Maryland*, 272 F.3d 625, 640 (4th Cir. 2001) (identifying factors relevant to proof of emotional distress damages in the Rule 59 context, including

34

"medical attention resulting from the emotional duress," "psychiatric or psychological treatment," and "physical injuries suffered as a result of emotional distress").

In sum, there is simply not a sufficient evidentiary basis for any award of compensatory damages for emotional distress. The jury's award, therefore, appears to have rested upon the mere fact that a violation of the anti-retaliation provisions of the FCA and DCWPA occurred and the Codys' conclusory testimony that they were upset about being terminated, as would commonly be the case for anyone who was laid off from a well-paying job. Much more is required. *See Doe*, 306 F.3d at 180.

Finally, we reject Kevin's contention that the district court made a legal error by not considering a remittitur of the emotional distress damages award as an alternative to vacating the entire award. The district court explained that because it found "that the evidence [was] insufficient as a matter of law to support an award of damages for emotional distress," it would "not reach the issue whether the awards [were] excessive and should be remitted." J.A. 561. Kevin—in his brief, at least—appears not to apprehend that the district court did *not* find his emotional distress damages *excessive* but found that he was not entitled to any such damages *at all*. The district court explained plainly that it was *not* reaching the excessiveness/Rule 59 issue. But Kevin nonetheless relies on a line of "excessiveness" decisions under Rule 59(a), arguing that when a court "concludes that a verdict is excessive, it is the court's duty to require a remittitur or order a new trial." *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 305 (4th Cir. 1998) (internal quotation marks omitted). Kevin argues that the district court failed to discharge this "duty" and therefore committed reversible error.

35

ManTech contends that Kevin's argument improperly conflates Rule 59(a) motions and Rule 50(b) motions. This may be true, but the most blatant flaw in Kevin's argument is that it rests on the false assumption that the district court actually determined that the emotional damages award was excessive. Again, it could not be any clearer that the district court did not address ManTech's *alternative* excessiveness argument because ManTech had prevailed on its primary argument. Regardless of the reason, Kevin has neither shown us evidence in the record giving him a basis for recovering emotional distress damages, nor pointed to anything else in the district court's order that would constitute an error as it related to the award of compensatory damages for emotional distress. We affirm on this issue.

IV.

To sum up, on ManTech's Appeal, we (1) AFFIRM the denial of ManTech's Rule 50(b) motion as it relates to its liability on KEVIN CODY'S retaliation claims under the FCA and the DCWPA; we (2) REVERSE the denial of ManTech's Rule 50(b) motion as it relates to its liability on MUGE CODY'S retaliation claims under the FCA and the DCWPA; and we (3) VACATE the verdicts in favor of MUGE CODY on her retaliation claims under the FCA and the DCWPA, and vacate as well any award of damages to MUGE CODY.

On the Cross Appeal, we (1) AFFIRM the district court's decision vacating the jury verdict awarding KEVIN CODY $500,000 in emotional distress damages, and we (2) conclude that, in light of our disposition of MUGE CODY'S retaliation claims, her cross appeal is MOOT and is hereby dismissed.

36

*AFFIRMED IN PART, VACATED IN PART,*
*DISMISSED IN PART, AND REMANDED*

DIAZ, Circuit Judge, dissenting in part[*]:

Kevin and Muge Cody worked on the same contract, voiced the same concerns, and engaged in the same protected activity. The Codys were placed on administrative leave the same day and suffered the same adverse employment action. And after a trial on the sole issue of causation, the jury found they were fired for the same retaliatory reason. The majority disagrees with this finding and says two differences between the plaintiffs require us to vacate the verdicts with respect to Muge. First, the majority contends that unlike Kevin, Muge was fired because of an external decision by the Army meaning "ManTech played no role in the elimination of Muge's job." Maj. Op. at 31–32. Second, the majority takes the view that ManTech's "motive to retaliate was greater with respect to Kevin than Muge" because he was the main antagonist. Maj. Op. at 32.

It may have been reasonable for the jury to find that Muge was fired for legitimate, nonretaliatory reasons. But it's something else entirely to conclude—as we must to overturn the verdict—that this was the only result a reasonable jury could have reached. *See Myrick v. Prime Ins. Syndicate, Inc.*, 395 F.3d 485, 489 (4th Cir. 2005). Ultimately, the distinctions the majority points to are not strong enough to overcome the deference owed to jury verdicts, nor do they support the divergent outcomes for Kevin and Muge Cody we now reach on appeal.

---

[*] I agree with the majority's decision to affirm the district court's denial of ManTech's Rule 50(b) motion with respect to Kevin Cody and to affirm the order vacating the Codys' emotional distress damages.

The problem with relying on the Army's decision as the reason for Muge's termination is that it implicitly assumes she would otherwise have returned to her role on the MRAP contract. But as the district court explained, the jury was free to consider whether "ManTech placed the Codys on administrative leave without any intention to ever allow them to return to work." J.A. 554. To this end, then-CFO Kevin Phillips testified that when he heard about the Codys' lawsuit he was concerned only from a "business perspective" and developed "an external press and reputational plan" to assure customers "there was no improper action" on ManTech's part. J.A. 1490–91. As part of that plan, Phillips "made the decision that Muge could not represent ManTech as the program manager on the program to the very customer she was saying that ManTech had defrauded." J.A. 1492. Taking Phillips at his word, he had no intention of letting Muge return to the MRAP contract, regardless of what the outside investigation found.

No other witness undermines this conclusion or suggests Muge was only on leave pending the outcome of the investigation. Chief Compliance Officer Terry Myers testified that she had no "understanding as to how long ManTech intended to maintain the Codys on administrative leave." J.A. 677. The same is true of Mike Brogan, Muge's direct supervisor, who was told of the decision and directed to read a script prepared by ManTech's "counsel and human resources . . . placing her on administrative leave." J.A. 1444. Brogan also informed the Army that "Nate Webster was being assigned as the acting program manager" and shared with them his "thought of the lawsuit in general," but Brogan never discussed Muge's future on the project. J.A. 1444–45.

39

By the time the Army eliminated the project manager position, Muge had been off the contract for six months, replaced by her former deputy, and represented a direct overhead cost borne by ManTech, not the client. ManTech may have fired Nate Webster as a result of the Army's decision, but he was the acting project manager. Muge was not. In short, ManTech never explained at trial how this event "changed the bitter status quo in any way." *Feldman v. Law Enf't Assocs. Corp.*, 752 F.3d 339, 349 (4th Cir. 2014). Nor is it clear to me that the investigation was still ongoing when the Army first announced its decision in April 2015. When asked, Bonnie Cook, the head of compliance for the MRAP contract, could not even tell the jury "approximately when [the auditor] concluded his investigation." J.A. 1057. That ManTech had a "legitimate and sufficient reason for its decision" is also irrelevant "if that reason did not motivate it at the time of the decision." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 252 (1989) (plurality). And nothing compelled the jury to accept ManTech's stated reason for firing Muge in light of Kevin Phillips' statement, the fact that neither of the Codys ever returned from administrative leave, and the history of animosity between the parties.

There is also no basis for us to conclude that Kevin Cody faced greater retaliatory animus than Muge. The majority sees Kevin as "the primary complainant stirring the pot about the accuracy and honesty of ManTech's bid" while Muge simply "shared Kevin's views that the company was retaliating against them." Maj. Op. at 32. But the trial testimony and written statements of numerous Mantech executives (including Lou Addeo, Dan Keefe, Terry Myers, Bonnie Cook, and Kevin Phillips) show that ManTech drew no such distinction.

40

It's true that Kevin Cody raised the initial pricing concerns in 2011, but both he and Muge looked into cost overruns in December 2012 and made the same complaints about possible fraud and retaliation going forward. When discussing the Codys, ManTech executives viewed Kevin and Muge as one and the same. For example, Kevin Phillips testified that after learning the Army was looking into possible fraud on the MRAP contract his "assumption was [] one of the Codys had made a complaint." J.A. 1488. Likewise, Lou Addeo told Terry Myers "[b]oth of them don't like to be managed. They think they are an entity inside the company. . . . It's an offense that we let them go this far." J.A. 1828. And Myers conducted one internal investigation into the "Cody Allegations," speaking with the same employees about the pair, and placing her findings into a single report even when the topics concerned only one of the Codys. J.A. 1805.

Deciding questions of motive, and how ManTech felt about Kevin and Muge, is also "a function peculiarly within the province of the fact finder, because so much depends on the opportunity to appraise the antagonists as they testify." *Whalen v. Roanoke Cty. Bd. of Supervisors*, 769 F.2d 221, 225–26 (4th Cir. 1985). But the majority usurps this role by suggesting ManTech had a greater desire to retaliate against Kevin. The jury evidently didn't think so, and its "finding of motive should not be set aside . . . unless the evidence clearly compels rejection." *Id.* at 226.

\* \* \*

The majority holds that a jury could find Kevin Cody was fired because of his qui tam lawsuit, but that no reasonable jury could say the same about Muge Cody. This is an awkward result. It's also one that the majority reaches by emphasizing individual people

41

and events rather than considering the record as a whole. Viewed within the broader context of this dispute, the supposed differences between Kevin and Muge relied upon by the majority are at best, debatable propositions, and at worst, unfounded conclusions. The jury reasonably found in favor of both plaintiffs. Because the majority holds otherwise as to Muge, I respectfully dissent.